## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

BANK OF MONGOLIA,            )
                                )
        **Plaintiff,**        )
                                )     **CASE NO. 08-CV-60623**
        **v.**               )     **Dimitrouleas-Snow**
                                )
**M&P GLOBAL FINANCIAL**     )
**SERVICES, INC., M&P GLOBAL**   )
**FINANCIAL SERVICES EUROPE, AG,** )
**GT INTERNATIONAL HOLDINGS, INC.,** )
**BURTON D. GREENBERG, SUZANNE** )
**GREENBERG, JOEL E. GREENBERG,** )
**SENOL TASKIN,**            )
**AND JAMES R. HALPERIN**     )
                                )
        **Defendants.**      )
_____)

## SECOND AMENDED COMPLAINT

Plaintiff, Bank of Mongolia, sues Defendants, M&P Global Financial Services, Inc., M&P Global Financial Services Europe, AG, GT International Holdings, Inc., Burton D. Greenberg, Suzanne Greenberg, Joel E. Greenberg, Senol Taskin, and James R. Halperin, and states as follows:

## I.    JURISDICTION AND VENUE

1.    This Complaint is brought pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et seq.*, as well as various state laws.

2.    This Court has subject matter jurisdiction over the claims for relief arising under RICO pursuant to 18 U.S.C. §1964(c).

3.    This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(b).

4.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and 18 U.S.C. §1965.

## II.    THE PARTIES AND OTHER RELEVANT PERSONS AND ENTITIES

5.      Plaintiff, Bank of Mongolia ("BOM"), is the central bank of Mongolia.  BOM is an instrumentality of the Government of Mongolia, with its principal office located at Baga Toiruu 9, Ulaanbaatar, Mongolia.  As the Central Bank of Mongolia, BOM is authorized, among other things, to implement the monetary policy of Mongolia.

6.      Defendant, M&P Global Financial Services, Inc. ("M&P"), is a company incorporated in Florida, with its principal place of business at 4300 North University Drive, D-106, Lauderhill, Florida.  M&P was incorporated on September 11, 1997.

7.      Upon information and belief, M&P has been at all relevant times owned and controlled by Burton D. Greenberg, Suzanne Greenberg, and Joel E. Greenberg.

8.      Defendant, M&P Global Financial Services Europe, AG ("M&P Europe"), is a company incorporated in Switzerland, with an office at 4300 North University Drive, D-106, Lauderhill, Florida.  M&P Europe shares the same office space in Florida as M&P and has the same two directors, Burton Greenberg and Joel Greenberg.

9.      M&P and M&P Europe act as a single entity and, upon information and belief, are indistinguishable in almost every respect.  M&P Europe is an alter ego of M&P.

10.     Defendant, GT International Holdings, Inc. ("GTI"), is a company incorporated in Florida, with its principal place of business at 4300 North University Drive, D-106, Lauderhill, Florida.  GTI was incorporated on October 25, 2007.

11.     Upon information and belief, GTI has been at all relevant times owned and controlled by Burton D. Greenberg, Suzanne Greenberg, and Joel E. Greenberg.

12.     Upon information and belief, GTI is the alter ego of M&P and M&P Europe, and has continued the business of M&P and M&P Europe following the initiation of this lawsuit, including the fraudulent activities alleged herein.

13.     Defendant, Burton D. Greenberg, is the President of M&P, an officer of M&P Europe, and an owner and director of GTI.

14.     Burton Greenberg shares the same office space as M&P, M&P Europe, GTI, Suzanne Greenberg, and Joel Greenberg.

15.     Burton Greenberg's name is listed at the office location in Florida, and neither the name of M&P, the name of M&P Europe, nor, upon information and belief, the name of GTI is listed there.

16.     Upon information and belief, Burton Greenberg does not separate his personal business from the business of M&P, the business of M&P Europe, or the business of GTI.  M&P, M&P Europe and GTI are, in all relevant respects, indistinguishable from Burton Greenberg.

17.     Burton Greenberg is the alter ego of M&P, M&P Europe and GTI.

18.     Defendant, Suzanne Greenberg works for M&P, M&P Europe, and GTI.

19.     Suzanne Greenberg shares the same office space as M&P, M&P Europe, GTI, Burton Greenberg, and Joel Greenberg.

20.     Upon information and belief, Suzanne Greenberg does not separate her personal business from the business of M&P, the business of M&P Europe, or the business of GTI.  M&P, M&P Europe and GTI are, in all relevant respects, indistinguishable from Suzanne Greenberg.

21.     Suzanne Greenberg is the wife of Burton Greenberg, and the mother of Joel Greenberg.

22.     Joel Greenberg is the alter ego of M&P, M&P Europe and GTI.

3

23.     Defendant, Joel E. Greenberg, is the Vice President and registered agent of M&P, an officer of M&P Europe, and a director and registered agent of GTI.

24.     Joel Greenberg is a lawyer licensed in Florida and maintains his office at 4300 North University Drive, D-106, Lauderhill, Florida, which is the same address as M&P, M&P Europe, GTI and Burton Greenberg.

25.     Joel Greenberg shares the same office space as M&P, M&P Europe, GTI and Burton Greenberg.

26.     Upon information and belief, Joel Greenberg does not separate his personal business from M&P, M&P Europe and GTI.   M&P, M&P Europe and GTI are, in all relevant respects, indistinguishable from Joel Greenberg.

27.     Joel Greenberg is the son of Burton Greenberg and Suzanne Greenberg.

28.     Joel Greenberg is the alter ego of M&P, M&P Europe and GTI.

29.     Defendant, Senol Taskin ("Taskin"), is the Senior Vice President of M&P and M&P Europe, and is an owner and director of GTI.

30.     Upon information and belief, Senol Taskin does not separate his personal business from M&P, M&P Europe and GTI.  M&P, M&P Europe and GTI are, in all relevant respects, indistinguishable from Senol Taskin.

31.     Senol Taskin is the alter ego of M&P, M&P Europe and GTI.

32.     Upon information and belief, Senol Taskin maintains or maintained agents, representatives, personnel, officials and/or assets within the state and/or is or has been doing business in Florida, and/or has continuous and systematic contacts with Florida.  Defendant Taskin has also committed acts within the State of Florida from which this action arises and is

subject to personal jurisdiction in this judicial district.  Taskin has on several occasions during the relevant time period travelled to Florida to conduct acts of the enterprise.

33.     Defendant, James R. Halperin ("Halperin"), is the President of Expar Investments Limited, Inc., a Florida corporation ("Expar").

34.     In 1991, Halperin pled guilty in Manhattan Supreme Court to embezzlement stemming from embezzling US$7 million dollars from a foundation of US$7 million dollars. Halperin served time in prison and was ordered to pay restitution.

35.     After being released from prison, Halperin was found to have violated the terms of his probation and was sent back to prison.

36.     Prior to his conviction, Halperin had been an attorney licensed to practice in New York.  Halperin has been disbarred.

37.     SDT Wealth Management, Inc. ("SDT Inc.") is an entity with offices in Ontario, Canada, Zug, Switzerland, and 4300 North University Drive, D-106, Lauderhill, Florida..  Upon information and belief, SDT Inc. is owned and controlled by Burton Greenberg.

38.     SDT Wealth Management, AG ("SDT AG"), is an entity with offices in Zurich, Switzerland.

39.     SDT Private BK Enterprises, SA ("SDT BK"), is an entity with offices in Zurich, Switzerland.

40.     IXE Financial Services, AG ("IXE"), is an entity with offices in Zurich, Switzerland.

41.     IXE Mercantile AG ("IXE Mercantile") is an entity with offices in Zurich, Switzerland.

SDT AG, SDT BK, IXE and IXE Mercantile have been at all relevant times owned, in whole or in part, and controlled by Alejandro Garcia.

42.     Stoneleigh International Limited ("Stoneleigh") is an entity incorporated in Labuan, Malaysia, with a purported office location at Unit Level 13(E), Main office Tower, Financial Park, Labuan, Malaysia.

43.     George Chalmers ("Chalmers"), is the President of Stoneleigh.

44.     Chalmers is a U.S. citizen living in Malaysia.

45.     Chalmers has a long-standing "business" relationship with Burton Greenberg, Joel Greenberg, Taskin, and Halperin.

46.     Stoneleigh worked in concert with Defendants to defraud BOM out of more than US$23 million.

47.     Ducom DMCC ("Ducom") is an entity incorporated in Dubai, UAE, with offices in Dubai and Zurich, and is purportedly in the commodities business.

48.     Al Raheel General Trading LLC ("Al Raheel") is an entity incorporated in Dubai, UAE, with offices in Dubai, and is purportedly in the commodities business.

49.     Faravardehay Roghanie Iran Co. ("FRICO") is an entity incorporated in Tehran, Iran.  Upon information and belief, Alejandro Garcia owns approximately 10 percent of FRICO.

50.     Rosbank is a Swiss subsidiary of a larger Russian bank, with offices in Geneva, Switzerland.

51.     Liechtensteinische Landesbank ("LLB") is a Swiss bank, with offices in Zurich, Switzerland.

### III.    NATURE OF ACTION

52.    This is a civil action brought by BOM against Defendants who, acting together and individually, and acting in connection with others, both known and unknown, defrauded BOM of more than US$23 million by making fraudulent statements and representations in connection with the BOM's issuance of documentary letters of credit, which remain unpaid.

53.    The Defendants' fraudulent activities, however, did not begin when the Defendants first met with BOM officials in 2005.  Nor did the Defendants' fraudulent activities end after they had defrauded the BOM.  The Defendants have a long and sordid history of committing fraud that has continued after the initiation of this lawsuit.  Most of the Defendants have been functioning as enterprise to defraud persons and entities since 1997, with other Defendants having joined the enterprise in or about early 2005.

54.    The Defendants have preyed on developing countries, unsophisticated investors and persons who were hoping to achieve substantial returns on their investments.  The Defendants' fraudulent game plan has remained fairly consistent over the years.  The Defendants represent to potential "marks" that the Defendants could take financial instruments or funds of the marks and provide guaranteed returns of between **200% to 400% annually**.  In addition to this false representation, the Defendants would tell the marks that their funds and/or financial instruments would never be at risk.  The Defendants would explain that the funds would never be used and that any financial instruments would be returned at maturity with no withholdings.

55.    The Defendants were more than happy to get their hands on whatever type of financial instrument they could and to figure out later how to transact the instrument.  With governments and central banks from developing countries, of which the Defendants often targeted, the Defendants would have these entities issue bank guarantees with one of the

Defendants as the beneficiary.  The Defendants would also try to cause these entities to issue letters of credit that the Defendants could use.

56.     For marks that were not central banks or governmental entities from developing countries, the Defendants would either seek to have these marks issue a letter of credit in the Defendants' name or to "block funds" of the marks so that the Defendants could raise a credit line against such funds.

57.     The methods used by the Defendants to convince potential marks to issue or sign over financial instruments to or to block funds for the Defendants' behalf has all the hallmarks of a fraud, such as the requirement of absolute secrecy, the refusal to provide detailed information and many statements that the "opportunities" they offered were not available to others.  A document recovered from the Defendants' computers as part of a forensic examination ordered by the Court provides a good example of what was said to potential "investors".  This document states in the footer of each page that the document is "**<u>CLASSIFIED</u>**".[1]  This document, which is attached to the Complaint as Exhibit A, purports to explain a hidden type of security that provides enormous returns.  The document states that the "issuing banks are precluded by agreement from disclosing the existence of these instruments, as are the investors, market traders, program managers and intermediaries".[2]  The document goes on to state that "losses in these programs are not possible".  The *pièce de résistance* of this document comes when it explains why banks will not confirm to a potential "investor" that these "programs" exist:

> "The issuing banks vehemently deny the existence of these instruments making these investments possible and non-issuing banks and most securities brokers are totally unaware of these programs.  Insiders to the investments, including issuing banks, traders, investors and intermediaries are all signatories to non-

---

[1]     Emphasis in original.

[2]     Apparently, everyone is prohibited from disclosing that these so-called instruments exist except for the Defendants.

disclosure/non-circumvention agreements and have no vested interest in disclosure.   Indeed, any insider that discloses any material fact of these programs faces banishment from the programs and their high profits and possible financial sanctions . . . Investors and intermediaries are precluded from disclosure of the returns and fees for two principal reasons: (1) the publicity would expose this hitherto very confidential activity by major world banks, (2) **once the programs' superior attributes were of public record, wholesale liquidation of commonly known investments could take place"** (emphasis added).

58.     As soon as the Defendants would gain access to a mark's financial instruments, by means of representations similar to the one above, the Defendants would seek to transact these financial instruments.  The Defendants would transact the financial instruments, such as letters of credit or bank guarantees, by finding persons or entities to pay money to the Defendants in exchange for payment rights under the financial instruments at a substantial discount.  The Defendants would use the money achieved from the transaction of these financial instruments for the Defendants' own benefit, which included in some cases paying some money to another mark in order to cause that mark to continue providing financial instruments to the Defendants.  The Defendants never intended to, and did not, provide any annual returns for the marks that issued the financial instruments.  To the contrary, the marks would later discover that their letters of credit, bank guarantees, etc. had been put at risk and that the marks were responsible for paying under the financial instruments.

59.     Fortunately, from the standpoint of the Defendants' intended victims, the Defendants were often unable to transact the financial instruments or to raise credit lines against funds deposited in banks by potential marks.  The Defendants would contact various banks in an effort to transact these financial instruments, but almost every reputable bank declined to transact these financial instruments.   For example, the Defendants had attempted to transact bank guarantees issued by victims by bringing these bank guarantees to various banks in the hopes

9

that these banks would pay the Defendants the face amount of the bank guarantee, minus a discount.[3]  These efforts, however, were most often not successful.

60.     The fact that the Defendants were not able to cause banks to transact these financial instruments would have been, at the time, a surprise to the Defendants' marks.  This is because the Defendants' promotional materials and their other representations included statements that the Defendants had strong relationships with reputable banks all over the world that would transact these financial instruments.  For example, one of the promotional materials sent to marks asserted that M&P had "established" many "associations" with "investment institutions, including and not limited to [sic] banks, investment security houses, etc."  The Defendants would boast that they significant relationships with the top 50 banks around the world.[4]

61.     The Defendants' fraudulent schemes have attracted the attention of various police and regulatory authorities around the world.  One of the members of the Defendant's enterprise was jailed in Italy for money laundering, with other members of the enterprise being investigated in Italy as well.[5]  Various of the Defendants have been investigated by the U.S. Securities and Exchange Commission and other police agencies.  Some of the Defendants' marks have threatened law suits and criminal referrals against the Defendants but do not appear to have followed through with these actions.  The Defendants have mostly been able to avoid detection and various sanctions by avoiding jurisdiction, hiding behind various persons and entities and

---

[3]     Attached as Exhibit B is a bank guarantee issued by the Bank of Laos.  The Defendants were not able to persuade any banks to pay the Defendants for these bank guarantees.
[4]     Although not relevant to the transaction of financial instruments, the Defendants would further boast about knowing Hollywood celebrities and captains of industry and high ranking government officials.
[5]     It is of interest to note that one of the Defendants' promotional materials following this event states that "M&P Global has now consolidated our offices in Europe, and has moved our office from Italy to the country of Sweden".  Consolidated, indeed.

doing business under many different names.  In fact, following the initiation of this lawsuit, the Defendants apparently have stopped using "M&P" and appear now to use "GTI" (Defendant GT International Holdings, Inc.) as one of the faces of the enterprise.

62.     A favorite target of the Defendants were developing countries such as Mongolia. The Defendants attempted to defraud Guinea, Burundi and Laos, among potential others.  The Defendants, for example, were able to cause the Central Bank of Laos to issue US$200 million in bank guarantees, although, fortunately for Laos, the Defendants were never able to transact these guarantees.  The Defendants knew that these countries had difficulty in obtaining financing.  The Defendants promised to provide these enormous returns, as well as to provide other purported investments in the country, in order to help these developing countries.  This was the approach the Defendants took when they targeted Mongolia and, specifically, the BOM, the country's central bank.

63.     BOM had been tasked by the government of Mongolia to raise funds for a US$1 billion affordable housing project in Mongolia's capital city, Ulaanbaatar (the "Affordable Housing Project").  Mongolia was also looking for additional investment for the country's developmental needs.

64.     BOM was unable to find financing for the Affordable Housing Project because international banks would not make funds available for the project, meaning that it was not "bankable".  In BOM's efforts to secure financing for the Housing Project, Defendants, and other entities and persons connected to Defendants, approached BOM officials.  Defendants, individually and collectively, used their businesses in Florida, Switzerland, Canada and elsewhere in order to identify persons and entities with assets and/or credit and to facilitate fraudulent transactions with respect to those assets and/or credit.  Defendants have used some or

11

all of the businesses located in Florida, Switzerland, Canada and elsewhere to facilitate their fraud against BOM.

65.     Defendants, individually and collectively, as well as others, represented to BOM that they could raise US$1 billion from investors for the Housing Project if BOM issued US$200 million in documentary letters of credit ("DLCs") to Defendants.  Defendants, individually and collectively, as well as others, made both oral and written representations to BOM officials that these DLCs would never be drawn upon and that the DLCs would be returned at maturity with no withholdings.  Defendants repeatedly reassured BOM officials that the BOM would be at no risk with regard to these DLCs, meaning that the BOM would never have to pay any money in connection with these DLCs.

66.     A DLC is a written undertaking issued by a bank, on behalf of an importer, to pay an exporter a given sum of money within a specified time, providing that the exporter presents documents to the bank that comply with the terms in the DLC.  DLCs are typically used in trade finance to facilitate payment for goods and commodities.

67.     DLCs typically include what is referred to as a "deferred payment date", which provides for a period of time, generally between 60 to 120 days following the date of the bill of lading, for the exporter to receive payment.  This deferred payment date is designed to allow enough time for the exporter to deliver the goods and for the importer to inspect the goods.

68.     Defendants represented to BOM officials that BOM's issuance of these financial instruments would show the financial world that Mongolia was serious about obtaining financing for the project.  Defendants indicated that, once this showing was made, international investors would come forward to finance the Affordable Housing Project and other initiatives in Mongolia. Burton Greenberg, for example, told a BOM official that the International Monetary Fund

12

required too many conditions for lending, but that his funding methods would allow the BOM to meet its development goals. The Defendants further represented that they had helped other governments raise money for developmental projects in various countries. Like the Defendants' other statements, this was a false statement in that the Defendants had not actually raised money for other countries.

69.     The Defendants further represented to the BOM that the Defendants could achieve a 200-400% annual return on the financial instruments issued by the BOM. This would allow the Bank of Mongolia, so the Defendants asserted, to raise quickly the bulk of the money needed for the Affordable Housing Project. Thus, with these returns and the "international investors" that Defendants claimed would be seeking to invest in Mongolia, the Defendants assured BOM officials that the Affordable Housing Project and other developmental projects would be financed.

70.     Through such representations, and a series of intentionally false, confusing and misleading statements, charts, data and various other documents, and after meeting with BOM officials, the Defendants gained the confidence of BOM. This confidence caused the BOM to initially issue US$200 million in bank guarantees to the Defendants. When the Defendants could not transact these bank guarantees, the Defendants caused BOM to issue US$55 million in DLCs. Out of these US$55 million in DLCs, the Defendants ultimately utilized US$21 million in DLCs for unrelated commodity transactions for sunflower oil and molasses.

71.     In connection with this case, the court ordered a forensic examination of some of the Defendants' computers. This examination revealed thousands of internal emails among the Defendants, among other relevant documents. These internal communications indicate that the Defendants knew that they could not generate the returns they promised to deliver to BOM upon

the issuance of the US$200 million in financial instruments issued by BOM, or the US$21 million in DLCs that was ultimately utilized. For example, in a June 2007 email, one of the Defendants admitted to other Defendants in an email that it "is impossible to generate enough profits to cover BOM".[6]

72.     Internal communications also show that Defendants had no intention of finding investors that would be interested in funding in the Affordable Housing Project or in Mongolia. Rather, Defendants intended to utilize the DLCs issued by BOM for separate, unrelated transactions for the Defendants' own benefit. Defendants' communications reveal that they viewed any future proceeds from the DLCs as "their", meaning the Defendants', money.

73.     At no time did Defendants inform any potential investor of the existence of the Affordable Housing Project. At no time did the Defendants seek to find investors for the Affordable Housing Project.

74.     Indeed, contrary to the Defendants' representations that the DLCs would not be utilized, the Defendants began transacting some of the DLCs as soon as they were issued. The Defendants submitted documents to the Swiss subsidiary of a Russian bank, Rosbank, purporting to show that shipments of commodities had occurred in order for Ducom, the beneficiary under the DLCs, to be paid under the DLCs. Rosbank paid Ducom approximately US$18.7 million in connection with the DLCs. This represents a significant discount from the face amount of the DLCs, which was more than $21 million.

75.     Ducom reportedly shipped the commodities to a company in Iran called FRICO for resale in Iran. FRICO thus received $21 million in commodities from Ducom in connection with the DLCs issued by BOM. FRICO, in turn, paid another Iranian company named Al Raheel

---

[6]     As set forth below, this admission was made at the same time that the Defendants were pressuring the BOM to issue additional DLCs.

the money related to the sale of the commodities.  Upon information and belief, FRICO and Al Raheel are related companies.  The Defendants never informed the BOM of the existence of FRICO or Al Raheel, or of the role that these entities would play in the DLC transacting.

76.     Al Raheel paid Garcia and his companies approximately $14 million for the commodities that FRICO received in connection with the DLCs issued by BOM.  Garcia paid the amounts set out below to the other Defendants, as well as other persons.  The US$14 million that Al Raheel paid to Garcia and ultimately the Defendants represents almost a 40% discount from the face amount of the DLCs.

77.     The Defendants never disclosed to the BOM that they had received any money in connection with these DLCs.  The Defendants never disclosed to the BOM that the commodities had been sold to FRICO or Al Raheel.  The Defendants never disclosed to the BOM that the DLCs would be transacted at all, much less in the manner in which the Defendants transacted the DLCs.  The Defendants never disclosed the substantial discount applied to their proceeds under the DLCs.  The Defendants still have not reimbursed BOM for the credit fraudulently extended to Defendants in the DLCs.

78.     Money that the Defendants derived from the DLCs was also given to another purported investor who has been promised substantial returns.  Specifically, Defendants used at least US$2.4 million from the funds derived from transacting the DLCs issued by BOM to pay another investor and/or the investor's broker (the "Swiss Investor").  Proceeds from the BOM DLCs were also used to pay substantial fees in connection with this Swiss Investor to Expar and James Halperin.   Monies from the BOM transaction were also used to line the pockets of Burton Greenberg, Suzanne Greenberg, Joel Greenberg and Alejandro Garcia, James Halperin, among others.

79.     Defendants were well aware that their activities were fraudulent.   Defendants, communicating among themselves, referred to the underlying DLC transaction as a sham. Defendant Taskin further acknowledged that Defendants' activities with regard to the BOM was "an international financial crime and fraud".   Defendant Joel Greenberg, after stating in an email to Burton Greenberg and Taskin that Joel Greenberg had "negotiate[d] an agreement that contained fraud" in connection with the activities of the enterprise, stated that he was "now exposed to losing [his] law license".

80.     As mentioned above, Defendants have used these same means and representations to defraud other "investors" both before and after the BOM transaction.   Defendants' modus operandi was to promise substantial, non-achievable returns to investors, promising further that the investors' funds would not be at risk during this process.

81.     To accomplish their fraudulent activities, Defendants, and others known and unknown, including agents and employees of Defendants, from in or about 2005, collectively constituted an associated-in-fact enterprise (hereinafter the "Enterprise") within the meaning of 18 U.S.C. §1961(4).   Defendants, together with others known and unknown, each participated in the operation and management of said Enterprise.

82.     Beginning on or about 2005, continuing through the date of the filing of this Complaint, Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of §1962(c).

83.     Additionally, from about 2005 continuing through the date of the filing of this Complaint, Defendants conspired to conduct the affairs of the Enterprise through a pattern of racketeering activity in violation of §1962(d).

84.     Together, and acting in concert with other unnamed members of the enterprise, Defendants perpetrated a scheme to defraud BOM out of more than US$24 million by causing BOM to issue the DLCs to Defendants, which have been presented for payment at various banks worldwide.

## IV.     FACTUAL BACKGROUND AND COMMON ALLEGATIONS

### The Affordable Housing Project

85.     Mongolia is a developing country with more than 1.5 million square kilometers of land and approximately 2.8 million citizens.[7]

86.     After achieving independence from China in 1921, Mongolia was under the domination of the Soviet Union from 1924 through 1992.  In 1992 Mongolia held the first democratic election in its modern history.  Still recovering from the Soviet era, Mongolia had a 2003 gross domestic product of US$1.2 billion, or approximately US$462 per capita.[8]

87.     Ulaanbaatar, the capital city of Mongolia, is the coldest capital city in the world, with winter daytime temperatures routinely falling to minus 40 degrees Celsius.[9]  A useful comparison is that, in a typical year, Malmoe, Sweden requires approximately 3,000 degree-days of heating while Ulaanbaatar requires approximately 7,655.[10]  Winter in Ulaanbaatar lasts for seven (7) months of the year.

---

[7]     *See* U.S. Census Bureau, *IDB Summary Demographic Data for Mongolia* (updated Apr. 26, 2005).

[8]     *See* United Nations Statistics Division (available at http://unstats.un.org/unsd/snaama/resultsCountry.asp?Country=496&Year=0&SLevel=99&Disp=Million) (reflecting GDP at 2003 prices).

[9]     *See* Asian Development Bank, *Report and Recommendation of the President to the Board of Directors on a Proposed Loan to Mongolia for the Ulaanbaatar Heat Efficiency Project* ("ADB's August 1997 Report").

[10]    *See id.*  A "degree-day of heating" is the sum over a one-year period of the difference between 17 degrees Celsius, the temperature at which heating is required, and the average daily temperature.

88.     There are reportedly over 10,000 homeless people in Ulaanbaatar and of those, more than 4,000 are believed to be children.  In addition, tens of thousands of additional residents of Ulaanbaatar live in makeshift and poorly constructed housing, almost all of which do not have heat.

89.     Unfiltered emissions from these tens of thousands of makeshift households pollute the winter air over Ulaanbaatar.  This smoke, combined with the  exhaust from the Soviet-era power stations used to generate electricity and supply heat to city buildings, forms a noxious smog.  Mongolian cities have the third worst air quality ranking in Asia and a recent survey by the Mongolia Health Ministry found that 70% of the respondents from Ulaanbaatar had symptoms of respiratory disease.

90.     In 2005, in order to address the inadequate housing situation and the severe pollution problems in Ulaanbaatar, the State Great Hural (Mongolia's Parliament) proposed and approved an "Affordable Housing Initiative" (the Affordable Housing Project described above) for the design and construction of 42,000 low-income housing units for the outskirts of Ulaanbaatar.  The Affordable Housing Project was estimated to cost US$1 billion.

91.     As the cost of the Affordable Housing Project was close to the countries total Gross Domestic Product, Mongolia was not capable of financing the Affordable Housing Project domestically.   The State Great Hural tasked BOM with finding private funding for the Affordable Housing Project.

92.     BOM officials looked outside of Mongolia for funding and were unsuccessful in securing financing for the Affordable Housing Project through international banks or institutional investors.  It was explained to BOM officials that the Affordable Housing Project

18

financing was unacceptable to banks, and the Affordable Housing Project was deemed not "bankable".

**George Chalmers and Stoneleigh**

93.     While BOM was seeking financing for the Affordable Housing Project, BOM had communications with a Malaysian company called Damairata, which presented itself to BOM officials as a company that could finance projects that were considered not bankable.  Damairata represented to BOM that it could help finance the Affordable Housing Project.

94.     In early 2005, officials from the Ministry of Finance and BOM officials traveled to Malaysia to attend a seminar regarding housing issues.  Boldbaatar, an official of the BOM, at the request of BOM officials, arranged for an in-person meeting with Damairata.  It was at this meeting with Damairata, which was also attended by Johnson, that BOM officials first met Chalmers.

95.     Chalmers told BOM officials that he was a financial advisor for Damairata and that he was the President of Stoneleigh, a company that was involved in private financing.  Chalmers provided materials to the BOM officials stating that Stoneleigh's principal business was raising capital through private and diverse institutional financial resources for infrastructure projects mainly involving sovereign entities throughout Asia.

96.     After the meeting in Malaysia, Chalmers and BOM officials continued to talk about financing in connection with the Housing Project.

**Chalmers and the Defendants' Scheme to Defraud Mongolia**

97.     For example, in 2004, Burton Greenberg told one potential investor that the Defendants could achieve returns of 400% of the investor's money.  When the investor asked whether that would be 400% per month or year, Burton Greenberg stated that it was per year.

Burton Greenberg went on to tell this potential investor as follows: "Originally we had up to 2000 percent 3 years ago" but that "those days are gone" and now they are "back to prudence". Moreover, when this potential investor asked about the "chance of loss" of the investment, Burton Greenberg curtly replied "None~!"   The Defendants would make other false representations to investors, including statements that the financial instruments were "screened" by Euroclear and that banks were involved in these transactions.

98.      As is typical for fraudulent transactions, the Defendants required secrecy and would not inform the "investor" in advance about the details of the investment.  In December 2006, one of the Defendants writing to other Defendants stated plainly that the Defendants were taking advantage of their "investors", writing that it "is the greed that drives them to us.  They think they can make huge profits without any risk".

99.      Chalmers had known James Halperin, Burton Greenberg, Suzanne Greenberg, Joel Greenberg and Senol Taskin prior to the time that Chalmers met BOM officials.

100.      These persons brought Alejandro Garcia into the enterprise in or about mid 2005 in order to have an agent in Switzerland for the operations of their enterprise.

101.      Since then, James Halperin, Chalmers, Burton Greenberg, Suzanne Greenberg, Joel Greenberg,  Taskin, Garcia and others have worked together in what they referred to as "Private Participation Investment Program Transactions" ("Private Participation Program") involving millions of dollars of Bank Guarantees and other financial instruments.  As part of this Private Participation Program, investors have been promised returns of between 200% to 1000% **annually** with no risk to the financial instruments.

102.      Upon information and belief, none of the investors have received even minimal returns on their investment, much less the annual returns promised by Defendants.

103.    Instead, many of these investors have accused the Defendants of fraud and/or threatened to bring legal action in connection with these transactions.

104.    Chalmers contacted Burton Greenberg, Suzanne Greenberg, Joel Greenberg and Halperin in connection with his discussions with BOM.  Chalmers, Burton, Suzanne, and Joel Greenberg and Halperin devised a fraudulent scheme whereby the Defendants would cause BOM to issue financial instruments to M&P, for which the Defendants would never repay.

105.    The communications among the Defendants, which included emails, telephone calls and letters, show that the Defendants were trying to find ways to transact financial instruments to be issued by the BOM so that the Defendants could use any funds derived from these financial instruments.

106.    Chalmers, Burton Greenberg and Taskin gained the confidence of certain BOM officials, who were desperate to find a source of funding for the Housing Project, by representing that they could raise the funds necessary for the Affordable Housing Project with the assistance of the other Defendants.

107.    Through a series of false statements and misrepresentations that took place over the following months, Chalmers and the Defendants used the misplaced confidence of BOM officials to convince the BOM, through dishonesty and with fraudulent intent, that the Defendants could raise the funds for the Affordable Housing Project.

108.    Chalmers and Burton Greenberg explained this financing scheme to BOM officials both orally and through a series of highly confusing charts and presentations that sought to obscure the fraudulent intent of the Defendants.  One such chart is attached as Exhibit C to the Complaint. Burton Greenberg made telephone calls and sent emails to the former BOM governor

21

in order make false representations that the Defendants could raise US$1 billion for the Affordable Housing Project and other developmental projects of Mongolia.

109.    In order to raise the funds for the Affordable Housing Project, Chalmers and the Defendants by means of telephone calls, facsimiles and e-mails, explained to BOM officials that these officials needed to issue $200 million in financial instruments.  Chalmers claimed that he and the other Defendants had "private capital" investors that would provide the funding for the Housing Project if BOM issued these financial instruments.  According to Chalmers, these supposed investors would see that BOM was serious about the Affordable Housing Project if BOM issued the financial instruments to M&P.

110.    To date, despite numerous requests by BOM, Chalmers and the Defendants have failed to identify any of these potential "private capital" investors.

111.    Chalmers and Burton Greenberg repeatedly represented to the BOM, both orally and in writing, that BOM would have no financial risk in connection with the issuance of the these financial instruments because said documents would never be presented for payment and would be returned to BOM at maturity with no withholdings.

112.    In addition to the oral representations and representations made in letters that the BOM would have no financial risk, several of the Defendants issued so-called "indemnities" to the BOM in order to induce the BOM to issue the financial instruments.  These documents styled as an "indemnity" contained identical language to the BOM representing, among other things, that any financial instruments issued by BOM to M&P, Defendants or Defendants' entities would never be presented for payment.  *See* example Indemnities attached hereto and incorporated herein as collective Exhibit D.  Defendants further represented in the indemnity that the financial instruments would be returned at maturity with no withholdings.  See Exhibit D.

22

113.    The following entities issued these indemnities:

    i.    SDT Wealth Management issued an indemnity signed by Burton Greenberg and Taskin;

    ii.    Stoneleigh International Limited issued an indemnity signed by George Chalmers;

    iii.    M&P Global Financial Services, Inc. issued an indemnity signed by Burton Greenberg; and

    iv.    IXE Mercantile AG issued an indemnity signed by Burton Greenberg.

114.    The Defendants were aware that the statements in these indemnities were false when made.  In fact, realizing the questionable nature of the representations contained in the indemnities, and in an attempt to conceal the fraud from outsiders, Defendants obtained a counterfeit notary stamp and thereafter forged the notarization on M&P Global Financial Services, Inc.'s indemnity to BOM.

115.    Upon information and belief, Defendant Suzanne Greenberg applied the counterfeit notary stamp and the associated forged signature to the M&P Global Financial Services, Inc. indemnity.  Defendant Suzanne Greenberg obtained the counterfeit stamp by posing as her former daughter-in-law.

116.    The Defendants further knew that the BOM would rely on these indemnities and other false statements made by the Defendants when issuing any financial instruments.

117.    The above false representations made by Defendants induced BOM to issue more than US$55 million in DLCs in which M&P was named as the "applicant" and one Standby Letter of Credit in which SDT was named as the beneficiary.

118.    Defendants knew and intended for the false representations to cause BOM to issue the DLCs.  In fact, Defendants knew that BOM would not issue the DLCs without the representations made in the indemnities.

119.    Defendants knew that the so called "indemnities" would never be honored.

23

120.     Defendants, speaking among themselves, referred to the indemnities as "in the end . . . just a piece of paper".

121.     The communications among the Defendants by email, specifically between and among Burton Greenberg, Joel Greenberg, Taskin and Halperin, show that the Defendants were presenting Chalmers with ways in which to communicate the scheme to the BOM so that the BOM would agree to issue the financial instruments.

122.     Chalmers and Burton Greenberg were working in concert with, and at the behest of, the Defendants when making the false statements and misrepresentations regarding (a) the financing of the project; (b) the financial risk to BOM; and (c) that the financial instruments would never be presented and would be returned to BOM at maturity with no withholdings. Other Defendants made similar representations.

123.     The Defendants, who were in the United States, Canada, and elsewhere, communicated regularly by telephone and e-mail in connection with these false statements and misrepresentations.

**The Bank Guarantees**

124.     On or around September 6, 2005, Stoneleigh and M&P entered into an "Asset Management Agreement", which was signed by Chalmers and Burton Greenberg (hereinafter referred to as the "Asset Agreement"). Burton Greenberg's signature was witnessed by a Florida notary. The Asset Agreement provided terms regarding the utilization of four bank guarantees that were to be issued by BOM for a total of US$200 million.

125.     The Asset Agreement stated that said Agreement was "for the mutual beneficial gain of each party". The Asset Agreement further provided that Stoneleigh would assign all of its rights under the bank guarantees to M&P.

126.    The Asset Agreement further provided that M&P would send "bi-monthly disbursements" to Stoneleigh for its share of the proceeds.

127.    Additionally, the Asset Agreement provides that Stoneleigh would make payments to the "intermediary". The "sole intermediary" in the Asset Agreement was specified as "Expar Investments", which Halperin was, at all relevant times, the president and registered agent, and which Michael, Jonathan and Adrienne Halperin were, at all relevant times, officers.

128.    None of the Defendants discloses the existence of this Asset Agreement to BOM until December 2007.

129.    In fact, the Defendants made to sure to hide the existence of this Asset Agreement from the BOM. This is because the Asset Agreement provides that the "Company", that is M&P, will use the DLCs to "Ensure that a credit line is raised against the bank instruments" and that the "amount of this credit will be no less than Fifty-Five Percent (55%) of the total face value".

130.    The Defendants' intention all along, therefore, was that the DLCs would be used to raise a credit line that was substantially less than the face value of the DLCs. This was not disclosed to the BOM prior to the issuance of the DLCs.

131.    Relying on the fraudulent statements made by Chalmers and Burton Greenberg, on behalf of themselves and the other Defendants regarding the funding for the Affordable Housing Project, BOM issued four financial instruments styled "Guarantees", each for US$50 million, with Stoneleigh as the beneficiary ("Guarantees").

132.    These Guarantees on their face were irrevocable, freely transferable and had a maturity date of September 1, 2010.

133.    The Guarantees were not issued in connection with any transaction or other financial event and resembled a demand payment instrument, not an actual guarantee.

134.    The language for the guarantees was provided to BOM by Burton Greenberg and Taskin.

135.    In the months after the purported Guarantees were issued, M&P, Burton Greenberg, Joel Greenberg and Taskin brought the Guarantees to various banks throughout the world in an effort to cash in said Guarantees.

136.    BOM is aware that M&P, Burton Greenberg, Joel Greenberg, and Taskin attempted to transact the Guarantees at Caja de Ahorros de Valencia bank in Spain ("CAV Bank") because following their efforts to transact the Guarantees, CAV Bank sent a SWIFT message to BOM commenting on the suspicious nature of the Guarantees and asking if BOM had actually issued said Guarantees.

137.    Further attempts were made to transact the Guarantees at other international banking institutions, including Credit Suisse and TD Bank.

138.    Chalmers and Burton Greenberg, on behalf of themselves and the other Defendants, reassured BOM that the issuance of these instruments would cause the funding for the Housing Project to be raised.

139.    In December 2005, BOM issued another four (4) Guarantees (via SWIFT message to Credit Suisse), each for US$50 million, with SDT as the beneficiary of two (2) of the Guarantees and Stoneleigh as the beneficiary of the other two (2) Guarantees.

140.    SDT is owned and controlled by Garcia and, upon information and belief, by Burton Greenberg, Joel Greenberg, and Taskin.

141.   Credit Suisse responded in a SWIFT that it could not "handle" the two Guarantees and that it was returning said Guarantees to BOM.

142.   Upon information and belief, none of the bank Guarantees, as described above, have ever been accepted by any bank.

**March 2006 Agreement and Indemnities**

143.   After numerous banks had rejected the Guarantees, Defendants had to find another way to fraudulently induce BOM to extend credit for their use.  Defendant Taskin came up with the idea to have the BOM issue DLCs for commodities transactions as the underlying transactions to make it easier for the Defendants to transact the financial instruments and receive money.

144.   In March 2006, BOM entered into a written agreement with Stoneleigh, which was signed by Chalmers, providing that BOM would issue US$200 million of either DLCs, standby letters of credit ("SLCs") or bank Guarantees to support the Housing Project.

145.   Upon information and belief, the March 2006 written agreement was written by Taskin and Joel Greenberg, and reviewed by Halperin, Burton Greenberg and Chalmers.

146.   The US$200 million that BOM was to issue was referred to by Chalmers as the "critical mass" necessary for the funding of the Housing Project to commence.

147.   Despite numerous requests from BOM, Defendants never explained why the mass was considered "critical" or to whom the mass would be critical.   None of the Defendants ever explained why it was necessary for the BOM to issue $200 million.  Instead, the number was presented to have a talismanic quality to it.

148.   The March 2006 agreement stated that the DLCs issued by BOM "will not be presented for payment and will be returned by the receiving bank at maturity with no withholdings." *See* attached Exhibit "E".

149.   To the contrary, the Defendants intended to use the DLCs to raise a credit line per their agreement in the Asset Agreement.

150.   Following the execution of the March 2006 agreement, but before BOM issued any financial instruments in connection with the March 2006 agreement, BOM received the indemnities discussed above.

151.   Upon information and belief, these indemnities were sent via facsimile and overnight courier delivery from M&P's location in Florida, as well as through email.

152.   Defendants and Chalmers, knew when they issued the indemnities, that the statements contained therein were false and that BOM was relying upon said false statements.

153.   Defendants did not have sufficient assets to cover an indemnity worth US$200 million.

154.   Burton Greenberg, for example, had declared bankruptcy in 2004 and had, at that time, judgments against him as well as a tax lien that totaled more than US$500,000.  Similarly, in 2004 Halperin had judgments and tax liens pending against him in for millions of dollars.

**Issuance of the DLCs**

155.   The operative language of the DLCs, as defined above, was supplied to BOM by Taskin, Burton Greenberg and Garcia.

156.   The Defendants made sure to tightly control this process.  Taskin, for example, told Chalmers that it was extremely important that the BOM contact Taskin directly if the BOM had any questions about the language of the text.  Taskin was adamant that this happen.

157.     These DLCs included deferred payment dates of 315 days, which is extraordinary in comparison to the typical deferred payment date (usually this is less than 180 days).

158.     Defendants utilized a long-deferred payment date in order to allow BOM to issue the US$200 million before the first issued DLCs would be presented to BOM for payment. Defendants' scheme to defraud BOM was dependant upon a lengthy deferred payment date. Defendants hoped that they could cause the BOM to issue the entire $200 million in DLCs before any of the DLCs were presented for payment.

159.     The communications by the Defendants and Garcia further indicates that they expected to receive from Al Raheel all the money due the Defendants prior to the DLCs being presented to the BOM for payment.

160.     Chalmers and Burton Greenberg made several statements to the BOM representing that Burton Greenberg, Taskin, Garcia, M&P and M&P Europe and others connected with the enterprise had expertise in investing and banking.

161.     In July through September of 2005, BOM, in reliance on the indemnities and statements of  Chalmers and Burton Greenberg, as well as other Defendants, issued US$55 million of DLCs and SLCs.  The DLCs provided for:[11]

    i.     Ducom to be the beneficiary;

   ii.     M&P Europe to be the applicant;

  iii.     the commodities shipped to be either sunflower oil or molasses;

  iv.     the shipments of the commodities were to be delivered to ports in the Middle East, including Iran and the U.A.E.;

   v.     the designation of the Swiss subsidiary of the Russian-bank, Rosbank, as the advising bank;

  vi.     sending the original commercial and shipping documents to BOM; and

 vii.     BOM to be the "reimbursing bank".

---

[11]     The four DLCs issued are attached as Exhibit H to this Complaint.

162.     Burton Greenberg and Taskin had frequent contact with BOM officials in order to cause the BOM to issue the DLCs to the banks decided upon by the Defendants.

163.     According to the shipping documents, the purported shipments left their respective ports within days after the issuance of the DLCs.  In one case, the shipment was already on the high seas when Defendants had BOM issue the DLCs.  None of this information was communicated to the BOM.

164.     Within less than two weeks following the date of the bill of lading corresponding to the first DLC, DLC-717, the beneficiary, Ducom, had delivered the shipping and the commercial documents to Rosbank.

165.     This occurred before the purported shipment was ever delivered to its destination.

166.     Rosbank then sent BOM the bills of lading and other shipping documents required under the DLC-717.

167.     Rosbank noted that there were discrepancies in the documents but, nonetheless, "requested" that BOM ask its customer to accept the documents.[12]

168.     The "acceptance" of the documents is important as Ducom, would not have been paid if the issuing bank did not accept the documents.  This would have meant that the Defendants would not have been paid either.

169.     Upon information and belief, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin, instructed BOM to accept the documents despite the obvious discrepancies.  These persons assured the BOM that this was normal protocol in these types of transactions.

---

[12]     In the first DLC transaction, Rosbank apparently sent BOM the original shipping documents. Subsequently, Chalmers instructed BOM to send a SWIFT to Rosbank stating that the originals were to be sent to SDT in Switzerland.

170.    Based on the fraudulent statements of Defendants and the Defendants' urging, BOM responded that it "accepted and approved the discrepancies as sent by your bank".

171.    The documents sent by Rosbank to BOM under DLC-717 were purportedly the "original" commercial and shipping documents, as is the standard practice with respect to DLCs.

172.    Defendants had, as discussed above, repeatedly provided assurances and representations to BOM that the DLCs would never be presented, and more importantly, that BOM would not be liable for the DLCs issued.

173.    In order to alleviate any suspicion that BOM may have had, Defendants Burton Greenberg and Taskin instructed the BOM to request that the original documents be sent to Garcia and SDT AG in Switzerland.  Garcia was aware of this scheme to have the original shipping documents sent to him.

174.    Burton Greenberg falsely represented to the BOM that the BOM could not be liable to pay under the DLCs if BOM did not have the original documents.

175.    All of the Defendants were familiar with banking practices, however, and knew that BOM would have to pay under the DLCs even if it did not have the original documents.

176.    Burton Greenberg and Taskin represented to the BOM that SDT AG would keep the originals in Switzerland in a file cabinet.

177.    These knowingly false representations provided BOM with a great level of comfort and BOM relied on said false statements and misrepresentations in believing that BOM would have no financial responsibility for the DLCs.

178.    In accordance with Defendants' instructions, BOM amended the DLCs to provide that the originals be sent to SDT AG in Switzerland, which was owned and controlled by some Defendants.  Garcia received and held on to the original shipping documents.  Garcia, as a

principal of SDT AG, held himself out to the agent of the Defendants and the enterprise in order to explain why the shipping documents should be sent to him.

179.    Following said amendment, BOM never again received the original shipping and commercial documents.

**Defendants Transact the Financial Instruments and Distribute Proceeds**

180.    As set forth above, the DLCs had a deferred payment date of 315 days from the date of the bill of lading.  As such, the beneficiary of the financial instruments was not entitled to payment until June 2007 for shipments that had purportedly taken place in July 2006.

181.    Defendants' scheme depended on causing BOM to issue US$200 million before any party approached BOM seeking payment on the DLCs.

182.    In order to be paid in a short time after the bills of lading were issued, Ducom, took a discount of 11% of the face value of the DLCs from the Swiss subsidiary of Rosbank to be paid shortly after the shipments.

183.    Rosbank, shortly after paying Ducom, forfaited the right to receive payment under the DLCs to Deutsche Forfait ("DF").  The purchase of trade finance instruments that mature at a later date is known in the financial industry as forfaiting.

184.    Upon information and belief, Defendants and Garcia were working with Rosbank and Deutsche Forfait to assist in the transacting the DLCs and to cause Ducom to be paid.  In a September 15, 2006 email sent by Burton Greenberg to Chalmers and the other Defendants, Burton Greenberg stated that the "first DLC for [US$21 million] should be ready this coming week".

185.    When Chalmers asked Burton Greenberg in a follow-up email whether that date was "firm", Greenberg replied by email that "I beleive [sic] so..LLB and Deitsche [sic] Forfait working together~!"

186.    The Defendants and Garcia received money in connection with the DLCs from the Iranian entity Al Raheel, which is reportedly a related company of FRICO.

187.    Defendants sold the right to receive payment under the DLC to Al Raheel for approximately 60% of the value of the obligations.   In effect, Defendants and Garcia used BOM's DLC to generate approximately US$14 million for their own benefit.

188.    This discount rate would be extraordinary had this not been a fraud, as Defendants were ostensibly giving up almost half the value of the obligations in exchange for being paid less than 315 days ahead of schedule.

189.    The discount rate for typical forfaiting transactions involving instruments with deferred payment dates varies between 1% to 5%.

190.    Some of the money received by the Defendants in connection with the DLCs issued by BOM went to the following persons and entities:

    i.    $2.4 million to a Swiss Investor to further another fraudulent scheme of the enterprise;

    ii.    $97,000 in fees in connection with furthering another fraudulent scheme regarding another investor;

    iii.    $350,000 to Halperin for "fees";

    iv.    Approximately $2 million into the Wachovia bank accounts of Burton, Suzanne, and Joel Greenberg;

    v.    Approximately $1 million went into bank accounts in Canada for the benefit of Taskin; and

    vi.    at least $3 million was retained by Garcia.

191.    Prior to Chalmers being paid, he had became concerned that the other Defendants would deny him a share of the proceeds from the DLC transactions. In an email in or around September 2006, Chalmers wrote to Burton Greenberg stating that "Since end of July I have been told that my monies were being wired".  Chalmers later cautioned Burton Greenberg by stating: "We can do great things/deals together so please do not give me the distinct impression I can be treated like dirt and any monies due to me are of no concern".

192.    Burton Greenberg replied to Chalmers by email that he had wired Chalmers money

193.    In addition to the money that Defendants eventually sent to Chalmers, Defendants sent US$1 million to Mongolian bank accounts controlled by Chalmers by wire transfer. Chalmers states that he distributed this money to persons in Mongolia and elsewhere.

194.    The Defendants made no efforts to place any controls upon the use of this money.

195.    This US$1 million was intended to further the fraud by Defendants, as communications between and among Defendants indicate that they believed it was necessary to provide some funds back to BOM in order to encourage it to issue additional DLCs for future commodities transactions similar to one described above.

196.    Defendants never paid any of the money they received in connection with the DLC transactions to BOM.   BOM has never received a dime of the proceeds that the Defendants received in connection with the DLCs.

197.    Even at this early stage in the transactions, Defendants were concerned about making sure that BOM was mollified by false promises and statements.  In a September 15, 2006 email, for example, Burton Greenberg stated that Defendants "need to 'pacify' Mongolians

concerns over delays before they will see the need to travel anywhere".   Burton Greenberg further wrote that "important we keep all parties 'hot' and heavy to the core".

198.    At the same time, however, Burton Greenberg congratulated himself on what Defendants had been able to achieve at BOM's expense.   Burton Greenberg wrote in an email: "and NOW especially with what we have accomplished..w/BOM..which is no longer just a transaction, BUT w [sic] have turned into a major (w/all eyes upon) ongoing transaction".

199.    Greenberg continued to tell Chalmers that "You (honestly) have NO idea of the questions that surround, and bans?? [sic] Questions..to what w have done, and how we are doing".

200.    Defendants during this time were making no efforts to raise money for the Affordable Housing Project.

201.    According to documents from Defendants, only $1 million of the $14 million received by Defendants was deposited into a bank, Saxo Bank, for trading.

202.     The Defendants never had any intention of using proceeds from trading of the $1 million for the benefit of the BOM.

203.    Joel Greenberg told Burton Greenberg and Taskin that they should keep the funds liquid at Saxo Bank so that the Defendants could use the funds later.

204.    Taskin later proposed that the Saxo Bank money be withdrawn and moved elsewhere due to the attention that the DLCs transactions had brought.

205.    In any event, the Defendants could not have turned this $1 million in a time period of 315 days, the deferred payment period of the DLCs, into the $21 million necessary to keep the BOM from having to pay the DLCs.  This fact was made clear by Joel Greenberg in an email to Burton Greenberg and Taskin dated August 7, 2007:

"What difference does it make about the $ - you keep saying getting our $.  What $.  And even if we get it, so what, how are we going to generate $21M.  You are not trading now with $1M in the bank . . . .  And we all see the picture of doom (I don't sleep at night), but come up with a solution instead of blaming this on me and Burt."

**BOM Begins to Review March Agreement and DLCs**

206.    In November 2006, Chalmers met with the governor of BOM, Alag Batsukh ("Batsukh"), and showed him the March 2006 agreement between Stoneleigh and BOM, which had been signed by the governor's predecessor.

207.    Chalmers told Batsukh that BOM had to issue another US$150 million of DLCs under the contract in order to reach the "critical mass" as described above.  Chalmers took these actions at the urging of the Greenbergs, Taskin, and Halperin.

208.    Also during this November meeting with Batsukh, Chalmers again falsely represented that the DLCs would never be presented to BOM for payment.  This representation was made after Chalmers and the other Defendants had instructed BOM to accept the documents that were presented for payment.  This representation was also made after the Defendants were well aware that the DLCs would be presented for payment and that the Defendants would only receive approximately 60% of the face value of the DLCs.

209.    Following the November 2006 meeting, Chalmers sent a letter to BOM that falsely provided that "none of the instruments were used for any other purpose than to support the funding for the 'Affordable Housing Project' in Ulaanbaatar."

210.    Shortly after this November 2006 meeting with Chalmers, Batsukh established a committee to review the agreement and the transactions with Stoneleigh and Chalmers.

**Defendants' Efforts to Cause More Financial Instruments to be Issued**

211.    As of November 2006, BOM had issued US$55 million in letters of credit to Defendants, which is considerably less than the US$200 million that Defendants had originally sought from BOM.

212.    Defendants desired to keep BOM interested in what they had to offer so that BOM would continue to issue DLCs.  The Defendants worried, however, that the BOM was becoming concerned about the fraudulent scheme and would not issue additional DLCs.

213.    For example, in a November 2006 email from Taskin to Burton Greenberg and Joel Greenberg, Taskin wrote that

> "Mongolia.  I see problems.  The question is why they didn't issue 2.4 M DLC.  We sent the request weeks ago.  Burt, you don't want to understand but there are problems."

214.    Because of this concern and the Defendants' desire to induce BOM to issue additional DLCs, Defendants arranged for a meeting to be held in Zurich in November or December of 2006 where Defendants would meet with the BOM officials to discuss issuing additional DLCs.

215.    In a November 17, 2006 email from Burton Greenberg to Chalmers, Burton Greenberg stated that it was "MORE important than ever that WE keep interest high in Mongolia".  Burton Greenberg also wrote, with respect to the meeting in Zurich, that "I see ONE avenue that might and should save our behinds".

216.    Defendants invited Rosbank and DF to the meeting in Zurich.

217.    Defendants also invited the then-BOM governor Batsukh to the meeting in Zurich, but Batsukh refused to attend the meeting.

218.    Defendants invited officials from LLB to attend the meeting in Zurich and they accepted the invitation and attended the meeting.

219.    Defendants also invited the president of the Trade and Development Bank of Mongolia ("TDBM"), which is a private bank that is neither owned nor controlled by BOM. The president of TDBM agreed to attend the meeting in Zurich.

220.    Halperin, Burton Greenberg, Joel Greenberg, and, upon information and belief, Suzanne Greenberg, traveled from the United States to Zurich for the meeting.  Taskin and Garcia also attended the meeting, as well as other members of the enterprise.

221.    At the meeting, Defendants attempted to coerce the president of TDBM into agreeing to issue financial instruments to Defendants.  Defendants came to the meeting with an agreement already drafted and pressured the president of TDBM to sign it.

222.    In the months following the Zurich meeting, the Defendants continued to represent to the BOM that the DLCs would never be presented for payment and that BOM would have no liability.  These representations were made at a time when the Defendants were not even trying to trade or invest any money in order to raise funds for repayment of the DLCs.

223.    Ultimately, the BOM decided not to issue any more DLCs.

**Defendants' Fraudulent Statements Regarding an Extension**

224.    As set forth above, Rosbank had forfeited the payment rights under the financial instruments in the secondary market to DF.

225.    DF, in turn, sold some payment rights to ING Belgium ("ING").

226.    The payment date for the first DLC came due on June 1, 2007, with an amount due of US$4.9 million.

227.    In an April 25, 2007 email from Alejandro Garcia, to Defendants Burton Greenberg and Joel Greenberg, Garcia wrote that he had completed an agreement with DF to

extend the maturity date (*i.e.*, the payment date) of DLCs for another 360 days and that he was traveling to Dubai to meet with DF officials to finalize the arrangement.

228.   Burton Greenberg forwarded Garcia's April 25, 2007 email to Chalmers.

229.   In the weeks leading up to June 1, 2007, the original payment date of the first DLC, Chalmers wrote several letters to BOM, on behalf of himself and the other Defendants, advising BOM that it should request an extension of 180 days for the deadline for the current outstanding DLCs because said extension of time was necessary to "properly wind down the transactions".

230.   The Defendants did not inform the BOM officials that Defendants and Garcia purportedly had already reached an agreement with DF to extend the maturity dates of the DLCs.

231.   Chalmers, on behalf of the Defendants, wrote in another letter to BOM that Defendants could not sell the commodities from the transaction until BOM had reached the "critical mass" and he reiterated that BOM would have no liability under the DLCs if BOM requested an extension to the payment dates.   This was another blatant false statement by Chalmers made on behalf of the Defendants.   By this time, Ducom had already delivered the commodities to FRICO and FRICO had already provided funds to the Garcia and the Defendants.   The Defendants were willing to make any statements at all to the BOM in order to cause the BOM to issue additional DLCs.   Defendants made the above representations to prevent BOM from discovering that it had been defrauded and so that BOM would issue additional DLCs to reach this made up "critical mass".

232.   While the Defendants were instructing Chalmers in June/July 2007 to pressure BOM through deceptive statements so that the BOM would issue additional DLCs, the Defendants' communications amongst themselves shows that the Defendants realized they were

in trouble.  Taskin wrote in June 2007 with regard to the BOM transaction that "This is a total screw up and I see no way out".  Taskin further stated in the email that "We are sinking every day deeper and deeper".

233.   The Defendants finally convinced the BOM to request extensions for the DLCs by reassuring the BOM that it would have no liability for the transactions.

234.   The Defendants further promised the BOM that the Defendants would pay the interest and fees associated with an extension.

235.   As a result of these fraudulent statements by Defendants, on June 7, 2007, BOM asked DF and ING (through Rosbank) for a 180 day extension under the DLCs.

236.   In the communication requesting the extension, BOM used the language provided to it via email from the Defendants, specifically Burton Greenberg and Taskin.

237.   In accordance with the instructions from Defendants, and based on the false representations from Defendants regarding liability and presentment, BOM received an extension of the payment dates of the DLCs from DF.  DF stated that it would extend the payment dates on the DLCs if BOM provided an irrevocable undertaking agreeing that BOM would not raise any objections to payment under the DLCs, and that said undertaking would be governed by Swiss law.  The undertaking also included an interest provision of US$1.2 million, as well as a restructuring fee.

238.   In a subsequent email, Burton Greenberg wrote that DF and Rosbank were "well aware" of the situation regarding BOM and that DF and he made further representations that he had discussed matters with DF.

239.   Burton Greenberg wrote this email to Chalmers knowing, and with the intention, that Chalmers would forward the email to BOM.

240.    BOM, pursuant to the instructions of Chalmers told to him by Burton Greenberg and Taskin, also requested that ING agree to extend the payment dates of the DLCs.  Chalmers told BOM officials that he had been in contact with ING and ING informed him that it would extend the payment dates if BOM would meet ING.  Chalmers had been told this information by the Defendants.  This communication was false.  Defendants knew, through their and Garcia's own negotiations, that ING intended to request immediate payment under the DLCs.

241.    BOM contacted ING and ING refused to grant an extension of the payment date to BOM and requested payment of its participation amount in the DLC transaction.  ING confirmed that it had never spoken with Chalmers nor made representations to Chalmers regarding the extension.

242.    BOM has paid ING more than US$3 million pursuant to the DLCs.

**Defendants Attempt Again to Cause BOM to Issue Additional Financial Instruments**

243.    Within days after causing BOM to extend the payment dates of the DLCs by making false statements and promises, Defendants once again set out to cause BOM to issue additional financial instruments to Defendants.

244.    In an email dated July 27, 2007, Burton Greenberg wrote to Chalmers, Joel Greenberg and Garcia stating that they needed to commit BOM to "supply paper for Stoneleigh to complete 'housing project'".  Burton Greenberg stated that Defendants should cause BOM to issue three (3) financial instruments with two (2) to three (3) year maturity dates.  Burton Greenberg further stated that Stoneleigh should be the applicant and M&P should be the beneficiary.

245.    Contained in that same email, Burton Greenberg stated that having BOM issue these additional financial instruments "aloows [sic] all to be handled", further stating that "we

41

will come out more than okay".  Greenberg further stated that "profits dispersed as we always spoke about".

246.    Despite repeated efforts by Defendants to cause BOM to issue additional financial instruments to Defendants, BOM never issued any additional financial instruments.

**BOM Seeks Payment from Defendants**

247.    After receiving the extension from DF, but before any payments were allegedly due, BOM officials made numerous attempts, via written correspondence to both M&P and Burton Greenberg, to cause Burton Greenberg and the other Defendants to reimburse BOM for the amounts it had paid out to ING under the DLCs.  *See* correspondence from BOM to Defendants attached hereto and incorporated herein as collective Exhibit "F".

248.    Defendants did not respond to any of these written letters.

249.    BOM officials became increasingly concerned that Defendants would not reimburse BOM for the funds paid to ING, as required under the indemnities and in accordance with Defendants' earlier representations.

250.    BOM officials decided that it was imperative for them to travel to Florida to meet with Burton Greenberg and Joel Greenberg to discuss repayment to BOM.

251.    On or about August 27, 2007, BOM wrote to M&P Europe (at their Florida address) stating that BOM officials planned to travel to Florida on August 29-31, 2007 "to demand an urgent payment" by M&P Europe of US$3,028,380 plus interest, "which the BOM had to pay ING" on behalf of M&P Europe.  See August 27, 2007 letter attached hereto and incorporated herein as Exhibit "G".  BOM wrote an additional letter requesting the financial statements of M&P Europe.

252.     When the Defendants received the letter from the BOM regarding a visit, the Defendants schemed to prevent the BOM from being able to visit the Greenbergs upon the officials arrival in Florida.  The Defendants joked that the BOM officials would be waiting a long time to see anyone.  The Greenbergs planned to avoid the BOM officials in the hopes that they would leave the country.

253.     On August 30, 2007, Burton Greenberg sent BOM a letter by facsimile from his Florida office, on M&P Europe letterhead, listing M&P Europe's Florida address, informing BOM that Burton Greenberg and Joel Greenberg would be available on September 17, 2007 to meet with BOM officials.  Defendants sent this August 30, 2007 correspondence to the BOM officials after the BOM officials had already arrived in Florida, with full knowledge that the BOM officials would have already left for Florida when the letter was sent. In accordance with their plan set out in emails among themselves, the Defendants made the BOM officials wait for two weeks in Florida and refused to meet with the BOM officials for this period in hopes that the BOM officials would leave.

254.     The BOM officials finally met with Burton Greenberg and Joel Greenberg on September 18, 2007.  In accordance with BOM's previous demands for payment, BOM again requested payment for the more than US$3 million paid to ING.

255.     In emails among themselves, the Defendants admitted that M&P was responsible for the DLCs.

256.     The Defendants further admitted in these emails that they had defrauded BOM.

257.     Yet in the meeting with the BOM officials, Burton and Joel Greenberg threatened the BOM officials and remained obstinate.  Burton Greenberg stated that nothing would be paid

to BOM.  Joel Greenberg became visibly angry when the BOM officials arrived at M&P and in a threatening tone, informed the BOM officials that it was a "mistake" for them to come to Florida.

258.    Burton Greenberg and Joel Greenberg threatened the BOM officials with litigation, stating that the BOM was in breach of an agreement with Stoneleigh to issue the $200 million in DLCs.

259.    The Greenbergs mentioned that M&P had an agreement with Stoneleigh and Chalmers regarding the commodities transactions.  The BOM officials requested said agreement and Burton Greenberg refused to provide it.

260.    Burton Greenberg further noted that Defendants had expected a gain of US$5 to 10 million in profit from the agreement with Chalmers.

261.     Burton Greenberg claimed that he was a victim of BOM.

262.    Joel Greenberg further stated that BOM had wasted their time by coming to Florida, and that BOM should issue additional financial instruments to Defendants.

**Defendants' Efforts to Cause BOM to Issue Additional Financial Instruments**

263.    Defendants thereafter continued to make false statements in order to cause BOM to issue additional bank Guarantees and DLCs.  On or about October 8, 2007, Chalmers wrote to BOM at the urging of the Defendants and stated that he and the Defendants believed that they could resolve the outstanding matters and reimburse BOM if BOM provided additional Guarantees and DLCs in the amount of US$150 million.

264.    On or about November 26, 2007, the BOM officials met with Chalmers to discuss his October 8, 2007 letter.  At the meeting, Chalmers repeated that BOM needed to issue additional DLCs or bank Guarantees to Defendants if BOM wanted to be paid.  When BOM requested that Chalmers provide some security for the transactions, Chalmers refused.

44

Chalmers had asked the Defendants prior to this meeting to provide additional indemnities to the BOM. But the Defendants had refused, and Chalmers relayed this refusal to the BOM.

265.    Chalmers told BOM that M&P had liability for the DLCs because it was the "applicant", as well as the contractual party and that M&P was "actually responsible for this."

266.    The Defendants continued to refuse to reimburse BOM for the more than US$3 million paid to ING and for the other amounts due under the DLCs, despite BOM's continued written requests.

267.    Instead, Defendants stated that they have no obligation to pay under the DLCs because BOM never issued the "critical mass" required by the March 2006 agreement.

268.    Shortly after the initiation of the above-captioned litigation, Defendants Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin discontinued their use of M&P and M&P Europe, and transferred all of M&P's and M&P Europe's operations to Defendant GTI.

269.    As late as Spring 2009, Defendants utilized GTI to continue the fraud by continuing their efforts to collect proceeds resulting from the fraudulent transacting of BOM's DLCs and using such proceeds for their own benefit in further transactions.

**The Fraud Against The BOM Is Only Part Of The Defendants' Fraudulent Activities**

270.    As set forth above, the Defendants have been engaged in fraudulent activities for years before approaching the BOM. Some of the Defendants' fraudulent activities include the following:

  i.    The Defendants induced the Bank of Lao to issue $200 million in bank guarantees with false representations similar to the ones made to BOM;

  ii.   The Defendants attempted to cause a man named Denley Wono, who is reportedly on an Interpol watch sheet, to place substantial funds in an account for the use of the Defendants. Wono never provided the funds to the Defendants;

    iii.    Burton Greenberg and Halperin, among other Defendants, tried to reach an agreement with a man named Bob Cotton wherein Cotton would deliver a potential "investment" so that the Defendants could raise substantial proceeds;

    iv.    Halperin, Chalmers and the other personal Defendants attempted to induce an entity named "Glory Fields" to issue $200 million in bank guarantees. Halperin, Chalmers and the Defendants issued a Memorandum of Understanding to Glory Fields stating that the $200 million would not be at risk and that Glory Fields would receive proceeds of $200 million in one year. This deal ultimately did not work out because the documents from Glory Fields were apparently fraudulent documents themselves;

    v.    Halperin, Chalmers and the other personal Defendants attempted to induce the government of Haining, a city in China, to issue bank guarantees of $140 million and to "block funds" of $45 million, for a total of $185 million. The Defendants promised the city of Haining that these funds and bank guarantees would not be at risk. The Defendants further promised to raise money for an LCD plant project in Haining. The city of Haining ultimately decided not to issue the bank guarantees or to block the funds;

    vi.    The Defendants entered into an "Asset Management Agreement" whereby M&P agreed to place an $150 million SLC for Decagon Company Limited. M&P had agreed to provide returns of 200% to 400% annually. Again, the Defendants represented that the funds would not be at risk.

271.    In addition to these transactions, the Defendants engaged in several other transactions. It is apparent from emails among the Defendants that these were all fraudulent transactions.

272.    For example, in an email from Burton Greenberg to Taskin on July 9, 2007, Burton Greenberg wrote that

    "I get at least 3X per week calls from Chang (Albert and Nelson), Global (Bruce and Finney etc.) about their monies..many times I go home with headache..about this..but my 'mouth' has keep the avenging angels off our backs so far".

273.    Burton Greenberg later wrote with apparent pride that he had been able to keep the Changs at bay for 8 years.

274.    The Defendants have also had their share of investigations and unhappy "investors" who have threatened criminal action.

275.    For example, Burton Greenberg, Taskin and other members of the enterprise named Thomas Sundell and Georges El Khoury (the "Italian Defendants") were accused by Italian authorities of conducting a criminal enterprise for the purpose of money laundering.  The Italian Defendants had induced various persons to sign over funds.  The Italian Defendants then had reportedly transferred those funds through several bank accounts, including through M&P's Wachovia account in Florida.

276.    In an email dated May 10, 2007 Taskin wrote to Burton and Joel Greenberg with a warning:

> "Burt, please control what you are saying, promising, telling to the people (investors).  I think that you, Joel everybody in your office are being monitored.  I also think IXE office (Alejandro, Domenic) is being monitored as well.  Please keep in mind that SEC is investigating you."

277.    Burton replied in an email that he had taken steps to insulate himself from the alleged fraud in Italy.  He wrote to Taskin and Joel Greenberg that "the banks all have documents signed (not by we) by GEK [George El Khoury]..as (Italian banks) asset mgt over funds".  Burton concluded that "we must be careful and we must NOT go into Italy".

278.    Upon information and belief, this investigation is ongoing with hearings to commence within the next year.

279.    All of the Defendants have been involved in fraudulent activities.  These activities have been undertaken as part of an enterprise designed to defraud persons and entities all over the world.  These activities have a similar pattern, with similar false representations being made to potential "investors".

**All Of The Defendants Have A Role In The Enterprise**

280.    All of the Defendants played a role in furthering the activities of the enterprise:

(a) Burton Greenberg was a key player in the enterprise. Burton Greenberg was the central communication point between the other Defendants in Florida, Canada and Switzerland. Burton Greenberg was primarily responsible for finding persons, i.e., marks, who would be willing to "invest" in these fraudulent schemes. Burton Greenberg acted as the primary point of contact with another enterprise member, Alejandro Garcia. Through Garcia, Burton Greenberg was in contact with the Iranian entities FRICO and Al Raheel and received funds from such entities. These funds were then distributed to the other Defendants. Burton Greenberg also utilized Garcia to work with DF and Rosbank to transact and extend the BOM DLCs.

(b) Suzanne Greenberg operated behind the scenes for the Defendants, the M&P entities, and GTI. Suzanne Greenberg participated in planning the fraudulent schemes against BOM and other. Specifically, Suzanne Greenberg assisted in drafting communications destined for BOM in furtherance of the scheme. Further, Suzanne Greenberg is responsible for the accounting of the Enterprise, and for the disbursement and concealment of the proceeds obtained by her, Burton Greenberg, Joel Greenberg, M&P, M&P Europe, and GTI from transacting the BOM financial instruments.

(c) Joel Greenberg was central in developing strategies about which purported investments to pursue and which ones not to pursue. Joel Greenberg was one of the key decision makers in deciding who the enterprise should do business with. Joel Greenberg also commented on many of the letters sent out by members of the enterprise.

(d) Senol Taskin has a background in banking and provided information for the enterprise about banking procedures. Taskin recommended specific banks to approach regarding transacting the DLCs. Taskin liaised with many of these banks in order to try to transact financial instruments.

(e) M&P Global Financial Services was the corporate face of the part of the enterprise located in North America. M&P was used to issue indemnities. Marketing material for M&P presents the company as a global team of financial and investment experts. M&P was represented to potential clients as being able to provide annual returns of at least 200% with no risk to the client's funds.

(f) M&P Europe is a company located in Florida that was used by the enterprise to provide purported legitimacy for the enterprise's European operations. M&P Europe was one of the corporate faces of the enterprise in Europe.

(g) James Halperin brought in some of the so-called investors into the enterprise. James Halperin was responsible for bringing the Swiss Investor as a client into the enterprise. James Halperin communicated almost daily with Burton Greenberg and George Chalmers on ways to cause the BOM to issue financial instruments. James Halperin was frequently pushing Burton Greenberg to use his contacts at banks to help transact the BOM financial instruments. James Halperin received

substantial fees from the transacting of the BOM DLCs. James Halperin also often served as a conduit through which the other Defendants would communicate with Chalmers regarding the transaction. Finally, James Halperin was the President of Expar Investments, the entity that was the so-called "intermediary" in the agreement between Stoneleigh and M&P.

(h) GTI is the entity that the North American Defendants have used following the initiation of this litigation. GTI is being used to continue the activities of the enterprise. GTI has received any funds that have been recently derived in connection with the BOM transactions.

**COUNT I**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**CONDUCTING THE AFFAIRS OF THE ENTERPRISE THROUGH**
**A PATTERN OF RACKETEERING ACTIVITY**
(Against All Defendants)

281.    BOM reincorporates and realleges each and every allegation in paragraphs 1 to 2767 above as if set forth fully herein.

282.    From on or about 2005, continuing through the filing of this Complaint, M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, Senol Taskin, SDT Inc., SDT AG, IXE, IXE Mercantile, SDT BK, Alejandro Garcia, Halperin, Chalmers and Stoneleigh, as well as their agents and employees, together with others, both known and unknown, including later GTI, formed an associated-in-fact "Enterprise" within the meaning of 18 U.S.C. §1961(4).

283.    From 2005, continuing through the filing of this Complaint, the Enterprise engaged in and took place in activities that affected interstate and foreign commerce.

284.    Defendants formed the Enterprise to execute and to attempt to execute a scheme to defraud BOM of money and property.

285.    From 2005 continuing through the filing of this Complaint, M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, Senol Taskin, SDT Inc., SDT AG, IXE, IXE Mercantile, SDT BK, Alejandro Garcia, Halperin, Michael Halperin, Jonathan Halperin, Chalmers and Stoneleigh, individually and together with others, both known and unknown to

49

BOM, including later GTI, were employed or were employed by and associated with the Enterprise and have in the past, continuously and currently continue to, in an ongoing manner, knowingly and intentionally, conducted the activities of the Enterprise, directly or indirectly, through a continued pattern of racketeering activity consisting of numerous acts of racketeering in Florida and elsewhere. The actions of all of the entities above include multiple, related acts in violation of the following provisions of the United States Code: Illegal Gratuity Payments, 18 U.S.C. §201(c); Mail Fraud, 18 U.S.C. §1341; Wire Fraud, 18 U.S.C. §1343; Travel Act, 18 U.S.C. §1952; and the Hobbs Act, 18 U.S.C. §1951, with the ultimate goal of defrauding BOM.

286. <u>Mail Fraud</u> (18 U.S.C. §1341): On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other and the remaining Defendants, used the United States mails and/or private or commercial interstate carriers in furtherance of a scheme to defraud BOM of money and property in violation of 18 U.S.C. §1341 (Mail Fraud) and 18 U.S.C. §2, as described throughout this Complaint.

287. <u>Wire Fraud</u> (18 U.S.C. §1343): On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other and the remaining Defendants, used interstate wires in furtherance of a scheme to defraud BOM of money and property, in violation of 18 U.S.C. §1343 (Wire Fraud) and 18 U.S.C. §2, as described throughout this Complaint. <u>Travel Act</u> (18 U.S.C. § 1952): On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other and the remaining Defendants, traveled internationally in furtherance of a scheme to defraud BOM of money and property, in violation of 18 U.S.C. §1343 and 18 U.S.C. §2, as described throughout this Complaint. <u>Hobbs</u>

Act (18 U.S.C. § 1951): On or about the dates indicated throughout this Complaint, Defendants and their employees and/or agents acting on their behalf, aided and abetted by each other and the remaining Defendants, traveled internationally and took other actions in furtherance of a scheme to extort and rob BOM of money and property, in violation of 18 U.S.C. §1343 and 18 U.S.C. §2, as described throughout this Complaint.

288.   The persons alleged herein to have violated 18 U.S.C. §1962(c) are separate from, though employed by or associated with, M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, Senol Taskin, GTI, and Halperin.

289.   Each Defendant had a role in the racketeering activity that was distinct from the undertaking of those acting on its behalf.

290.   Each Defendant attempted to benefit, and did benefit, from the activity of their employees and agents alleged herein, and thus were not passive victims of racketeering activity, but rather were active perpetrators.

291.   BOM has been injured in its business or property as a direct and proximate result of the Defendants' violations of 18 U.S.C. §1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

292.   As a result of the violations of 18 U.S.C. §1962(c) by Defendants, BOM has suffered substantial damages in an amount to be proved at trial.

293.   Pursuant to 18 U.S.C. §1964(c), BOM is entitled to recover treble damages for both its general and special compensatory damages, plus interest, costs and attorneys fees, incurred by reason of Defendants' violations of 18 U.S.C. §1962(c).

WHEREFORE, Plaintiff, BOM, demands judgment against each of the Defendants to recover treble damages for its general and special compensatory damages, plus interest, costs and attorney's fees, by reason of defendants' violations of 18 U.S.C. §1962(d).

## COUNT II
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT CONSPIRACY TO CONDUCT THE AFFAIRS OF THE ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY IN VIOLATION OF §1962(C)
(Against All Defendants)

294.     BOM reincorporates and realleges each and every allegation in paragraphs 1 to 276 above as if set forth fully herein.

295.     Beginning on or about 2005, and continuing through the time of filing in this Complaint, M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, Senol Taskin, SDT Inc., SDT AG, IXE, IXE Mercantile, SDT BK, Alejandro Garcia, Halperin, Chalmers and Stoneleigh, and others unknown and unknown, including later GTI, being persons employed by and associated with the Enterprise, did unlawfully, knowingly and intentionally conspire, combine, confederate and agree together to conduct of the affairs of the Enterprise, which was engaged and involved in the activities, which affected interstate and foreign commerce, through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

296.     Each Defendant agreed that at least (2) two acts of racketeering activity would be committed by a member of the conspiracy in furtherance of the Enterprise.

297.     It was part of the conspiracy that Defendants and their co-conspirators would commit numerous acts of racketeering activity in the conduct of the affairs of the Enterprise, including but not limited to, the acts of racketeering set forth herein.  The pattern of racketeering activity, as defined by 18 U.S.C. §1961(1) and (5) includes multiple repeated acts of:

(i)       Mail Fraud, 18 U.S.C. §1341;

(ii)     Wire Fraud, 18 U.S.C. §1343;

(iii)    Travel Act, 18 U.S.C. §1952;

(iv)    Hobbs Act, 18 U.S.C. §1951;

298.    In furtherance of this unlawful conspiracy, and to effect its objectives, Defendants committed numerous overt acts, including but not limited to those set forth in throughout this Complaint.

299.    BOM has been injured in its business or property by reasons of Defendants' violations of 18 U.S.C. §1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity.

300.    As a result of the conspiracies between and among all of the Defendants to violate 18 U.S.C. §1962(c), BOM has suffered substantial damages, in an amount to be proved at trial.

301.    Pursuant to 18 U.S.C. §1964(c), BOM is entitled to recover treble damages for both its general and special compensatory damages, plus interest, costs and attorney's fees, by reason of Defendants' violations of 18 U.S.C. §1962(d).

WHEREFORE, Plaintiff, BOM, demands judgment against each of the Defendants to recover treble damages for its general and special compensatory damages, plus interest, costs and attorney's fees.

**COUNT III**
**CIVIL THEFT PURSUANT TO FLORIDA STATUTE §772.11**
(Against M&P, M&P Europe, Burton Greenberg, Joel Greenberg And James Halperin)

302.    BOM reincorporates and realleges each and every allegation in Paragraphs 1 to 276 above as if set forth fully herein.

**303.**    M&P, M&P Europe, Burton Greenberg, Joel Greenberg, and James Halperin, jointly and severally, knowingly obtained or used the personal property of BOM, to wit: $23

Million Dollars, with the intent to either permanently or temporarily deprive BOM of a right to the property or a benefit from the property, or with the intent to either permanently or temporarily appropriate the property to their own use or the use of any person not entitled to the use of the property.

304.    M&P's, M&P Europe's, Burton Greenberg", Joel Greenberg's, and James Halperin's above-described actions were in violation of Florida Statutes §812.014.

305.    As a direct and proximate result of the actions of M&P, M&P Europe, Burton Greenberg, Joel Greenberg, and James Halperin as described above, BOM has been injured.

306.    All conditions precedent to this civil theft action have been met, including the civil theft demand letter mandated by Florida Statutes §772.11.  A copy of said letters is attached hereto as Exhibit I.

307.    As a result of the actions described above, BOM has been required to retain legal counsel and incur attorney's fees and costs to prosecute this action.

308.    Pursuant to Florida Statutes §772.11, BOM is entitled to treble damages suffered, plus attorney's fees.

WHEREFORE, Plaintiff, BOM, demands judgment against M&P, M&P Europe, Burton Greenberg, Joel Greenberg, and James Halperin, jointly and severally, for treble damages, and attorney's fees in accordance with Florida Statutes §772.11, costs and such other relief as the Court deems just and proper.

## COUNT IV
## FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

309.    BOM reincorporates and realleges each and every allegation in Paragraphs 1 to 276 above as if set forth fully herein.

310.    Defendants, jointly and severable, intentionally made false statements of fact and representations to BOM, or intentionally omitted relevant facts from their statements and representations to BOM, regarding certain then current and prospective conditions as set forth in above, for the purpose for inducing BOM to issue DLCs.

311.    For example, Defendants repeatedly represented to BOM that the DLCs would never be presented for payment and that the DLCs would be returned at maturity with no withholdings.  Additional statements were made by Defendants to BOM and are set forth above and contained in written correspondence.

312.    Defendants knew, or should have know, that said representations were false when they were made, or knowingly omitted telling BOM the truth when Defendants should have done so.

313.    Defendants made their false statements, or omitted telling BOM the truth, with regard to the commodity shipments, as outlined above, because, among other reasons, Defendants had arranged for the commodity shipments pursuant to the DLCs before the DLCs were ever issued.

314.    Defendants knew that making these false statements would induce BOM to issue the financial instruments (the DLCs).

315.    Defendants made the statements, representations or omissions intending that BOM would rely on the false statements or omissions.

55

316. BOM relied upon Defendants' false statements and were in fact induced into issuing the financial instruments.

317. BOM was damaged as a result of Defendant's false statements of fact and misrepresentations.

WHEREFORE, Plaintiff, BOM, demands judgment against Defendants, M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, Senol Taskin, GTI, and Halperin, jointly and severable, for damages in excess of $3,000,00.00, costs and such other further and different relief as the Court may deem just proper and equitable under the circumstances.

## COUNT V
## NEGLIGENT MISREPRESENTATION
(Against All Defendants)

318. BOM reincorporates and realleges each and every allegation in paragraphs 1 to 276 above as if set forth fully herein.

319. Defendants, jointly and severally, made statements and representations to BOM, regarding certain then current and prospective conditions as set forth in above, which Defendants may have thought were true at the time they were said, but were in fact false. Said statements were made for the purpose for inducing BOM to issue DLCs.

320. For example, Defendants repeatedly represented to BOM that the DLCs would never be presented for payment and that the DLCs would be returned at maturity with no withholdings. Additional statements were made by Defendants to BOM and are set forth above and contained in written correspondence.

321. Defendants were negligent in making their statements and representations because they should have known that their statements false when they were made.

56

322.    Defendants made the statements or representations intending or expecting BOM to rely on them.

323.    BOM relied upon Defendants' statements and representations and issued the financial instruments.

324.    BOM was damaged as a result of Defendant's misrepresentations and false statements of fact.

WHEREFORE, Plaintiff, BOM, demands judgment against Defendants, M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, Senol Taskin, GTI, and Halperin, jointly and severable, for damages in excess of $3,000,00.00, costs and such other further and different relief as the Court may deem just proper and equitable under the circumstances.

## COUNT VI
## BREACH OF CONTRACT RELATING TO THE INDEMNITY
(Against All Defendants except James Halperin and GTI)

325.    BOM reincorporates and realleges each and every allegation in paragraphs 1 to 276 above as if set forth fully herein.

326.    Defendants M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin (or their alter egos) issued documents styled as an "indemnity" to BOM representing, among other things, that any financial instruments issued by BOM to Defendants or Defendants' entities would never be presented for payment.

327.    All of the indemnities included language stating that the DLCs would never be presented for payment to BOM and that the DLCs would be returned to BOM at maturity with no withholdings.

328.    Contrary to Defendants' oral and written representations, the DLCs were presented for payment and were not returned at maturity with no withholdings.

329.    As a result of the issuance of the DLCs, BOM has paid ING more than US$3 million.

330.    BOM had demanded that Defendants reimburse BOM for the payment of ING more than US$3 million, but Defendants have refused.

331.    Further, every contract has an implied duty of good faith and fair dealing between the parties.  Pursuant to the terms of the DLCs, Defendants had certain obligations and duties to BOM.

332.    These obligations and duties have not been met or satisfied as stated above.  As such, Defendants have failed to meet its implied duty of good faith and fair dealing.

333.    Defendants breach has caused BOM to suffer substantial monetary damages, including, but not limited to, payment of Ducom under the DLCs.

WHEREFORE, Plaintiff, BOM, demands judgment against M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin, for damages in excess of $3,000,000.00, costs, attorneys fees and such other, further and different relief as the Court may deem just, proper and equitable under the circumstances.

## COUNT VII
## BREACH OF CONTRACT RELATING TO
## THE DOCUMENTARY LETTERS OF CREDIT
(Against All Defendants Except James Halperin and GTI)

334.    BOM reincorporates and realleges each and every allegation in paragraphs 1 to 276 above as if set forth fully herein.

335.    As stated in detail above, M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin (or their alter egos) entered into a contract with BOM regarding the DLCs.

336.    M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin agreed, by their use of the DLCs, to pay BOM for the amount it reimbursed Ducom under the DLCs.

337.    M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin breached their obligations to BOM with regard to the DLCs when the DLCs were presented for payment and when the DLCs were not returned at maturity with no withholding and by M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin.

338.    Defendants have refused to pay the BOM for the amounts due under the DLCs.

339.    Further, every contract has an implied duty of good faith and fair dealing between the parties.  Pursuant to the terms of the DLCs, M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin had certain obligations and duties to BOM.

340.    These obligations and duties have not been met or satisfied as stated above.  As such, M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin have failed to meet its implied duty of good faith and fair dealing.

341.    M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin breach has caused BOM to suffer substantial monetary damages, including, but not limited to, payment of Ducom under the DLCs.

WHEREFORE, Plaintiff, BOM, demands judgment against M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin, for damages in excess of

$3,000,000.00, costs, attorneys fees and such other, further and different relief as the Court may deem just, proper and equitable under the circumstances.

**COUNT VIII**
**CONTRACT INDEMNIFICATION**
(Against All Defendants Except James Halperin and GTI)

342.    BOM reincorporates and realleges each and every allegation in paragraphs 1 to 276 above as if set forth fully herein.

343.    As stated above, M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin issued documents styled as an "indemnity" to BOM representing, among other things, that any financial instruments issued by BOM to Defendants or Defendants' entities would never be presented for payment.

344.    M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin further represented in each indemnity that the DLCs would never be presented for payment to BOM and that the DLCs would be returned to BOM at maturity with no withholdings.

345.    Both the indemnity provided by M&P and the indemnity provided by SDT, Inc. were signed by Burton Greenberg and Taskin.

346.    As a result of the issuance of the DLCs, BOM has paid ING more than US$3 million pursuant to the DLCs.

347.    BOM had demanded that Defendants reimburse BOM for the payment of ING of more than US$3 million, but Defendants have refused.

348.    M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin have not reimbursed BOM for the credit fraudulently extended to Defendants in the DLCs despite having received these commodities and despite repeated demand.

349.     BOM specifically denies any wrongdoing with regard to the DLCs and the damages to BOM are a direct and proximate result of inaction by Defendants.

350.     BOM has incurred significant damages in having to pay ING more than US$3 million pursuant to the DLCs.

351.     BOM's damages were foreseeably caused by M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin and such Defendants have a duty and obligation to indemnify, defend and hold BOM harmless.

352.     In addition, BOM has incurred attorney's fees for prosecuting this claim, which M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin are also responsible for.

WHEREFORE, Plaintiff, BOM, respectfully requests that this Court enter judgment against M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin, for any and all sums related the payment of more than US$3 million to ING, all sums related to the instant action, including interest, costs, and attorney's fees and such other and further relief as this Court may deem proper.

### COUNT IX
### COMMON LAW INDEMNIFICATION
(Against All Defendants)

353.     BOM reincorporates and realleges each and every allegation in Paragraphs 1 to 276 above as if set forth fully herein.

354.     This is an action for common law indemnification.

355.     As stated throughout this Complaint, Defendants continually represented to BOM that any financial instruments issued by BOM to Defendants or Defendants' entities would never

be presented for payment and that the financial instruments would be returned at maturity with no withholdings.

356.    As a result of the issuance of the DLCs, BOM has paid ING more than US$3 million pursuant to the DLCs.

357.    BOM had demanded that Defendants reimburse BOM for the payment of ING more than US$3 million, but Defendants have refused.

358.    Defendants have not reimbursed the BOM for the credit fraudulently extended to Defendants in the DLCs despite having received these commodities and despite repeated demand.

359.    BOM specifically denies any wrongdoing with regard to the DLCs and the damages to BOM are a direct and proximate result of inaction by Defendants.

360.    BOM has incurred significant damages in having to pay ING more than US$3 million pursuant to the DLCs.

361.    BOM's damages were foreseeably caused by Defendants and Defendants have a duty and obligation to indemnify, defend and hold BOM harmless.

362.    In addition, BOM has incurred attorney's fees for prosecuting this claim, which Defendants are also responsible for.

WHEREFORE, Plaintiff, BOM, respectfully requests that this Court enter judgment against Defendants, for any and all sums related the payment of more than US$3 million to ING, all sums related to the instant action, including interest, costs, and attorney's fees and such other and further relief as this Court may deem proper.

**COUNT X**
**CONVERSION**
(Against All Defendants)

363.    BOM reincorporates and realleges each and every allegation in paragraphs 1 to 276 above as if set forth fully herein.

364.    Defendants converted the property of BOM for its own use by causing BOM to pay ING for payments made under the DLCs that had been paid to Defendants and others known and unknown.

365.    Defendants have wrongfully asserted an act of dominion over BOM's property as described above which was inconsistent with the ownership of said property.

366.    Defendants have never reimbursed BOM for the amounts paid pursuant to those DLCs.

367.    Defendants have converted the property of BOM for their own benefit and use without compensation.

WHEREFORE, Plaintiff, BOM, demands judgment against Defendants, for damages in excess of $3,000,000.00, costs, attorneys fees and such other, further and different relief as the Court may deem just, proper and equitable under the circumstances.

**COUNT XI**
**UNJUST ENRICHMENT**

368.    BOM reincorporates and realleges each and every allegation in paragraphs 1 to 276 above as if set forth fully herein.

369.    Defendants have received money and/or property, directly or indirectly, from BOM pursuant to the DLCs.

370.    Defendants have never reimbursed BOM for the amounts paid by BOM pursuant to the DLCs.

371.    Defendants have been unjustly enriched as a result of receiving the commodities and not paying BOM for the amount BOM paid under the DLCs.

WHEREFORE, Plaintiff, BOM, demands judgment against Defendants, for damages in excess of $3,000,000.00, costs, attorneys fees and such other, further and different relief as the Court may deem just, proper and equitable under the circumstances.

## COUNT XII
## ALTER EGO AGAINST M&P

372.    BOM reincorporates and realleges each and every allegation in paragraphs 1 to 276 above as if set forth fully herein.

373.    M&P is a company incorporated in Florida which is owned and controlled by Burton Greenberg and Joel Greenberg, and controlled by Taskin.

374.    M&P shares the same office space in Florida with M&P Europe, GTI, Burton Greenberg, Suzanne Greenberg, and Joel Greenberg.   M&P shares the same office space in Canada with Taskin, M&P Europe, and GTI.  Burton Greenberg's name is listed at the office location in Florida and the name M&P is not listed or posted at this office.

375.    Upon information and belief, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin do not separate their personal business from M&P and they are, in all relevant respects, indistinguishable from M&P.

376.    M&P is an alter-ego of Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin, and is used by them for their personal benefit.

377.    As stated throughout this Complaint, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin acted improperly in the use of M&P to induce BOM to extend DLCs.

378.    Burton Greenberg's, Suzanne Greenberg's, Joel Greenberg's, and Taskin's improper use of M&P to secure these DLCs caused significant injury to BOM.

379.    M&P was created by Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin to perpetrate a fraud upon its business partners and entities that it did business with .

380.    Defendants, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, Taskin, M&P Europe, and GTI are therefore the alter ego of M&P and are personably liable for the debts and obligations of M&P, including, but in no way limited to the debts of M&P as described herein.

**WHEREFORE**, BOM demands judgment for damages against M&P, M&P Europe, GTI, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin for costs, pre-judgment interest and such other and further relief as this Court may deem proper.

## COUNT XIII
## ALTER EGO AGAINST M&P EUROPE

381.    BOM reincorporates and realleges each and every allegation in paragraphs 1 to 276 above as if set forth fully herein.

382.    M&P Europe is a company incorporated in Switzerland, which is owned and controlled by Burton Greenberg, Suzanne Greenberg, and Joel Greenberg, and controlled by Taskin.

383.    M&P Europe shares the same office space in Florida with M&P Europe, GTI, Burton Greenberg Suzanne Greenberg, and Joel Greenberg.  M&P Europe shares the same office space in Canada with Taskin, M&P, and GTI.  Burton Greenberg's name is listed at the office location in Florida and the name M&P Europe is not listed or posted at this office.

384.    Upon information and belief, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin do not separate their personal business from M&P Europe and they are, in all relevant respects, indistinguishable from M&P Europe.

385.     M&P Europe is an alter-ego of Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin and is used by them for their personal benefit.

386.     As stated throughout this Complaint, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin acted improperly in the use of M&P Europe to induce BOM to extend DLCs.

387.     Burton Greenberg's, Suzanne Greenberg's, Joel Greenberg's, and Taskin's improper use of M&P Europe to secure these DLCs caused significant injury to BOM.

388.     M&P Europe was created by Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin to perpetrate a fraud upon its business partners and entities that it did business with .

389.     Defendants, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, Taskin, GTI, and M&P, are the alter ego of M&P Europe and are personably liable for the debts and obligations of M&P Europe, including, but in no way limited to the debts of M&P Europe as described herein.

**WHEREFORE**, BOM demands judgment for damages against M&P Europe, M&P, GTI, Burton Greenberg, Suzanne Greenberg, Joel Greenberg and Taskin for costs, pre-judgment interest and such other and further relief as this Court may deem proper.

<u>COUNT XIV</u>
<u>ALTER EGO GTI</u>

390.     BOM reincorporates and realleges each and every allegation in paragraphs 1 to 276 above as if set forth fully herein.

391.     GTI is a company incorporated in Florida, which is owned and controlled by Burton Greenberg, Suzanne Greenberg, and Joel Greenberg, and controlled by Taskin.

66

392.    GTI shares the same office space in Florida with M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, and Joel Greenberg.  GTI shares the same office space in Canada with Taskin, M&P, and M&P Europe.  Burton Greenberg's name is listed at the office location in Florida and the name GTI is not listed or posted at this office.

393.    Upon information and belief, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin do not separate their personal business from GTI and they are, in all relevant respects, indistinguishable from GTI.

394.    GTI is an alter-ego of Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin and is used by them for their personal benefit.

395.    As stated in this Complaint, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin acted improperly in the use of GTI to conduct business using the proceeds they improperly obtained in transacting BOM's DLCs.

396.    Burton Greenberg's, Suzanne Greenberg's, Joel Greenberg's, and Taskin's improper use of GTI caused significant injury to BOM.

397.    GTI was created by Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin to continue the fraud upon its business partners and entities that it did business with.

398.    Defendants, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, Taskin, M&P, and M&P Europe, are the alter ego of GTI and are personably liable for the debts and obligations of GTI, including, but in no way limited to the debts of GTI as described herein.

**WHEREFORE**, BOM demands judgment for damages against GTI, M&P, M&P Europe, Burton Greenberg, Suzanne Greenberg, Joel Greenberg, and Taskin for costs, pre-judgment interest and such other and further relief as this Court may deem proper.

## JURY DEMAND

399.    Plaintiffs hereby demand a trial by jury on all counts and issues so triable.


Dated: March 30, 2010                    MILBANK, TWEED, HADLEY
                                         & MCCLOY LLP
                                         Counsel for Plaintiff
                                         1850 K Street, N.W.
                                         Suite 1100
                                         Washington, D.C. 20006
                                         Ph:   (202) 835-7547
                                         Fax: (202) 263-7547
                                         Michael D. Nolan
                                         Edward G. Baldwin

                                         ATKINSON, DINER, STONE,
                                         MANKUTA & PLOUCHA, P.A.
                                         Counsel for Plaintiff
                                         One Financial Plaza, Suite 1400
                                         100 S.E. 3rd Avenue
                                         Ft. Lauderdale, FL  33394
                                         Ph:   (954) 925-5501
                                         Fax: (954) 920-2711

                                         __/ s / Jose M. Sanchez_____
                                         DAVID B. MANKUTA
                                         FLORIDA BAR NO. 216801
                                         JOSE SANCHEZ
                                         FLORIDA BAR NO. 0050288

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 30th day of March, 20010 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document was served via e-mail and U.S. Mail, to all counsel of record and *pro se* Defendants identified on the attached Service List.

MILBANK, TWEED, HADLEY
& MCCLOY LLP
*Counsel for Plaintiff*
1850 K Street, N.W., Suite 1100
Washington, D.C. 20006
Ph:   (202) 835-7547
Fax: (202) 263-7547
Michael D. Nolan
MNolan@milbank.com
Edward G. Baldwin
EBaldwin@milbank.com

ATKINSON, DINER, STONE,
MANKUTA & PLOUCHA, P.A.
*Co-Counsel for Plaintiff*
100 S.E. 3rd Avenue, Suite 1400
Ft. Lauderdale, FL  33394
Ph:   (954) 925-5501
Fax: (954) 920-2711

 **/S/  Jose M. Sanchez**
DAVID B. MANKUTA
FLORIDA BAR NO. 216801
DBM@atkinson-diner.com
JOSE M. SANCHEZ
FLORIDA BAR NO. 0050288
JMS@atkinson-diner.com

<u>**SERVICE LIST**</u>
Bank of Mongolia vs. M&P Global Financial Services, Inc. et al
CASE NO.08-CV-60623 Dimitrouleas-Rosenbaum
United States District Court, Southern District of Florida


Ronald K. Lantz, Esquire
*Counsel for M&P Global Financial Services, Inc.,*
*M&P Global Financial Services Europe, AG,*
*GT International Holdings, Inc.. Burton D. Greenberg*
*and Joel E. Greenberg*
First Professional Building
636 U.S. Highway One, Third Floor
North Palm Beach, Florida 33408
rklesq2@yahoo.com


James R. Halperin
*Pro Se*
6237 San Michel Way
Delray Beach, Florida 33484
vettesfl@comcast.net


Senol Taskin
105 Burloak Drive
Oakville, Ontario L6L 6E8
Canada