## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

BANK OF MONGOLIA,                    :

     Plaintiff,                   :

     vs                           :

M & P GLOBAL FINANCIAL               :
SERVICES, INC., M & P GLOBAL         :
FINANCIAL SERVICES EUROPE, AG,       :
GT INTERNATIONAL HOLDINGS, INC.,     :
BURTON  D. GREENBERG,                :
JOEL E. GREENBERG, SENOL TASKIN      :
AND JAMES R. HALPERIN                :

     Defendants.                  :

CASE NO. 08-CV-60623
Dimitrouleas - Snow



## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant James R. Halperin *pro se* ("Halperin"), hereby moves this Court for entry of an Order, Pursuant to Rule 56 (b) of the Federal Rules of Civil Procedure granting Summary Judgment in favor of Halperin against Plaintiff Bank of Mongolia "(BOM") and providing such other and further relief as this Court deems just and proper, and as grounds therefore states:

Halperin will show the Court that there is no genuine issue as to any material fact.  In addition, Halperin will show that BOM has only made a series of unsubstantiated allegations in its complaint and has done nothing more that raise the specter that there is some metaphysical doubt as to the material facts raised by these unsubstantiated allegations; and that Halperin is therefore entitled to Summary Judgment as a matter of law.

Halperin will also show that BOM has not even met the threshold of the definition of Common Law Fraud in the State of Florida, to wit: (i) a false statement of a material fact (ii) the person making the false statement knew it was false; (iii) that the person making the false statement knew that it was

1

false (iv) that the false statement was made with the intent that the other party would rely on the false statement; and (v) that the other party actually relied on the false statement and was thereby prejudiced.. Romero v. Romero, 32 Fla. L. Weekly D 1000 (2007) (quoting Ward v.Atl. Sec. Bank, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001), 148 N.J. 582, 610 (1997).

BOM has readily conceded that (i) Halperin has never had any form or written communication with BOM; (ii) Halperin has never contacted, met with or spoken to BOM; (iii) Halperin has never made any representations to BOM; (iv) Halperin has never suggested to BOM that it issue any financial instrument of any kind or character; (iv) Halperin has never solicited BOM or suggested that BOM participate in an investment related transaction; and (v) BOM only became aware of Halperin in February 2008.[1]

Halperin will additionally show that the transaction in question did not qualify as a transaction that would be governed under 18 U.S.C. §1961 Racketeer Influenced and Corrupt Organization Act ("RICO").

## BRIEF PROCEDURAL HISTORY

This action commenced by the filing of a complaint on or about June 20, 2008 by BOM against Halperin alleging that Halperin amongst other things (i) Conducted the Affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962 (Count I); (ii) Conspired to Conduct the Affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962 (C) (Count II); (iii) Conversion (Count IX); and (iv) Unjust Enrichment (Count X).

On or about July 9, 2008 filed a Motion to Dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12 (b). Plaintiff's response was filed on or about July 28, 2008 and on or about October 6. 2008 the Court issued an Order Denying Motion to Quash Process and Motion to Dismiss. Defendant Halperin duly filed his Answer on or about October 9, 2008.

---

[1] Stipulation in Lieu of Bank Of Mongolia Depositio dated March 30, 2010; *See* Exhibit A hereto.

On or about April 17, 2009 BOM served Halperin with its First Request For documents which Halperin duly responded to on April 24, 2009.

On or about December 11, 2009 BOM  served Halperin with an Amended Complaint alleging that Halperin amongst other things (i) Conducted the Affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962 (Count I); (ii) Conspired to Conduct the Affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962 (C) (Count II); (iii) Civil Theft (Count III); (iv) Fraudulent Misrepresentation (Count IV);   (v) Negligent Misrepresentation; (vi) Common Law Indemnification (Count IX); (vi) Conversion (Count X); and (vii) Unjust Enrichment Count XI). Halperin duly filed his Answer on or about January 17, 2010.

On or about January 2, 2010 Halperin served his First set of Interrogatories on BOM. On or about February 4, 2010 BOM filed its objections on the grounds that there were 28 Interrogatories.  On or about January 2, 2010 Halperin served BOM with a Request for Documents.  BOM responded on or about February 4, 2010.

On or about January 21, 2010 BOM served Halperin with its First set of Interrogatories which were duly responded to on February 21, 2010. On or about January 21, 2010 BOM served Halperin with its Second Request for Documents which was duly responded to on February 19, 2010.

On or about February Halperin served BOM with a revised First Set of Interrogatories which was responded to by BOM on March 22, 2010.

## STATEMENT OF FACTS

### Parties and Other Relevant Persons to the Transaction

**Bank of Mongolia** – Bank of Mongolia is the Central Bank of Mongolia, an instrumentality of the Government of Mongolia and located in Ulaanbaatar, Mongolia.[2]

---

[2] *See* Plaintiff Amended Complaint, Page 2, §5

**Stoneleigh International Limited** ("Stoneleigh") – an entity incorporated and located in Labuan, Malaysia and a Defendant in BOM's original Complaint.[3]

**George Chalmers("Chalmers")** – is a U.S. Citizen, who represented he was a Vice President of Citibank in Hong Kong and has resided in Hong Kong and Malaysia for more than ten years and is the President of Stoneleigh and a Defendant in BOM's Original Complaint.[4]

**M & P Global Financial Services Europe, AG** ("M & P AG**")** - is a Company incorporated in Zug Switzerland.[5]

**Senol Taskin** – is a resident of Toronto, Canada and is a Defendant in the instant action.

**Burton Greenberg** ("B. Greenberg") – is a Defendant in the instant action and a resident of the State of Florida.

**Joel E. Greenberg** – is a Defendant in the instant action and a resident of the State of Florida.

**M & P Global Financial Services, Inc.** ("M & P") – is a Corporation duly organized and existing under the laws of the State of Florida and a defendant in the instant action.

**James R. Halperin** – is an individual who resides in the State of Florida and a Defendant in the instant action.

**SDT Wealth Management, Inc.** – is a foreign corporation with offices in Ontario, Canada, Zug Switzerland.[6]

**SDT Wealth Management, AG** – a Corporation with offices in Zurich, Switzerland.[7]

**SDT Private BK Enterprises, SA** – an entity with offices in Zurich, Switzerland.[8]

**IXE Financial Services, AG** – An entity with offices in Zurich, Switzerland.[9]

**IXE Mercantile AG** - An entity with offices in Zurich, Switzerland.[10]

---

[3] *See* Plaintiff's Complaint, Page 4 §25
[4] *See* Plaintiff's Complaint, Page 4, §40, 41
[5] *See* Plaintiff's Amended Complaint, Page 2, §8
[6] *See* Plaintiff's Amended Complaint Page 5, §32
[7] *See Plaintiff's Amended Complaint Page 5, §33*
[8] *See* Plaintiff's Amended Complaint *Page 5, §34*
[9] *See* Plaintiff's Amended Complaint *Page 5, §35*

**Alejandro Garcia** – a resident of Switzerland with offices in Zurich, Switzerland.

**Ducom DMCC** ("Ducom") – a Dubai Corporation with offices in Dubai & Zurich, Switzerland.[11]

**Al Raheel General Trading LLC** ("Al Raheel") - a Dubai Corporation with offices in Dubai.[12]

**Faravardehay Roghanie Iran Co** ("FRICO") - an Iranian Company.[13]

**Rosbank** – A Swiss subsidiary of a Russian Bank with offices in Geneva, Switzerland.[14]

**Liechtensteinische Landesbank** – a Swiss Bank with offices in Zurich.[15]

## Brief Factual Background

Commencing December 2001, Halperin was continuously and exclusively employed by Expar Investments Limited, Inc.,[16] a corporation duly incorporated under the laws of the State of Florida ("Expar"). Expar's main business was that of a business consultant.   As one facet of its business, Expar would act as a business broker and put parties of similar interests together and earn a contingent fee if a transaction was successfully concluded.[17]

Sometime in 2001 Halperin was introduced to Chalmers by Mr. Brian Walker, an English Barrister, who introduced Mr. Chalmers as a client who was desirous of acquiring project financing for a project in Asia.  Chalmers introduced himself as an American Citizen who was employed previously by Citibank as a Senior Vice President in Hong Kong for some twenty years presently living in Malaysia[18].

---

[10] See Plaintiff's Amended Complaint *Page 5, §36*
[11] See Plaintiff's Amended Complaint *Page 6, §44*
[12] See Plaintiff's Amended Complaint *Page 6, §45*
[13] See Plaintiff's Amended Complaint *Page 6, §46*
[14] See Plaintiff's Amended Complaint *Page 6, §47*
[15] See Plaintiff's Amended Complaint *Page 6, §48*
[16] Halperin Employment Agreement, Exhibit B hereto
[17] See Exhibit D hereto
[18] See BOM's Amended Complaint *Page 5, §41*

In or about December 2001, Halperin and Adrienne Halperin of Expar met with George Chalmers in Boca Raton, Florida. Chalmers subsequently became a Client of Expar. Halperin as President of Expar introduced Chalmers to B. Greenberg of M & P in December 2001. Mr. Greenberg represented himself as a person and company that specialized in Project Financing. He represent that he was able to generate returns in of 200% - 400% of funds invested. In proof of his claim he produced statements of what he represented were clients showing the returns over a period of time. Chalmers and M & P unsuccessfully sought to transact transactions between 2001 and 2005.[19] During this period of time Chalmers requested the assistance of Expar in his dealings with potential clients and in fact Halperin of Expar spent numerous hours of uncompensated time on various Chalmers related matters.

In or about June/July 2005, Chalmers, in the normal course of business, informed Halperin of Expar that his company Stoneleigh had entered into an Agreement with BOM on May 24, 2005 to issue $200 Million Dollars of Bank Guarantees to be used as collateral to fund trading to generate sufficient funds to permit the construction of the Affordable Housing Project of the Government of Mongolia. On or about August 31, 2005 at the request of George Chalmers of Stoneleigh, Halperin of Expar forward copies of four Bank Guarantees issued by BOM to Stoneleigh to Burton Greenberg.[20]

On September 8, 2005, M & P entered into an Asset Management Agreement with Stoneleigh to use the Four BOM Bank Guarantees to establish credit lines utilizing the proceeds to enter into Private Placement Investment Financing Programs.[21] On September 8, 2005 Stoneleigh also entered into its customary Fee Agreement with Expar.[22]

On Sept 12, 2005, Stoneleigh notified BOM that it had entered into an Asset Management Agreement with M & P and that it had assigned and transferred the Bank Guarantees to M & P

---

[19] *See* BOM's Amended Complaint, Page 20 §96
[20] *See* Exhibit C hereto
[21] *See* Exhibit D hereto
[22] *See* Exhibit E hereto

consistent with the terms and conditions of the Asset Management Agreement and that the Bank Guarantees would be further assigned to M & P Global Financial Services Europe, AG.[23]   On September 12, 2005 Stoneleigh duly assigned and transferred the four Bank Guarantees to M & P. BOM duly acknowledge receipt of the assignment.[24]   M & P thereafter duly assigned the Bank Guarantees to M & P Global Financial Services Europe, AG, which assignment was duly acknowledged and confirmed by BOM[25].

M & P AG was not able to raise a credit line by using the BOM Bank Guarantees as collateral and on or about March 9, 2006 Stoneleigh entered into an Agreement with Stoneleigh whereby it would issue US200 million  of DLCs to a Beneficiary designated by Stoneleigh.[26]   At the request of BOM Stoneleigh, M & P and SDT Wealth Management issued Letters of Indemnity to BOM.[27]

From July through September BOM issued 4 DLCs.[28]   M & P AG was the Applicant on each DLC and Ducom was the Beneficiary.  Ducom shipped the commodities to FRICO and FRICO paid Al Raheel the money related to the sale of the commodities.[29]   Al Raheel payed Alejandro Garcia and/or his companies $US14 million for the commodities that FRICO received.[30]   It is alleged that Alejandro Garcia paid amounts set forth "below" to other Defendants.[31]

Ducom sold the DLCs to Rosbank and Rosbank forfeited the right to receive payment under the DLCs to Deutsche Forfait.  ("DF")[32]

## LEGAL ARGUMENTS
### POINT I
### COUNT I OF PLAINTIFF'S COMPLAINT
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

---

[23] *See* Exhibit F hereto
[24] *See* Exhibit G hereto
[25] *See* Exhibit H hereto
[26] *See* BOM's Amended Complaint, Exhibit E
[27] *See* BOM's Amended Complaint, Exhibit D
[28] *See* BOM's Amended Complaint, Exhibit H
[29] *See* BOM's Amended Complaint, Page 14 § 72
[30] *See* BOM's Amended Complaint Page 14 § 73
[31] *See* BOM's Amended Complaint Page 14 § 73
[32] *See* BOM's Amended Complaint Page 31 § 178 & 179

## CONDUCTING THE AFFAIRS OF THE ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY IS INSUFFICIENT AS A MATTER OF LAW

### A. RICO Violations

The principal assertion of Count I of Plaintiff's Complaint is that Halperin was part of an associated in fact Enterprise within the meaning of 18 U.S.C. §1961 (4) which was formed to execute and to attempt to execute a scheme to defraud BOM of money and property. The RICO act provides for Civil Liability under 18 U.S.C. §1962 (a) – (d). Thus in order to establish a Federal RICO violation under 18 U.S.C. §1962 (c) BOM must satisfy four elements of proof: (i) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. **Williams v. Mohawk Indus, 465 F.3rd 1277, 1282 (11th Cir. 2006); Jones v. Childers, 18 F.3d 899, 910, (11th Cir. 1994); Sedima, S.P.R.L. v. Imrex Co. 473 U.S. 479, 496 (1985).**

With regard to elements (1) and (2) of the four part test, BOM must establish conduct of an enterprise and that the enterprise has a common goal. **United States v. Turkette, 452 U.S. 576, 583 (1981).** Furthermore, Halperin "must participate in the operation or management of the enterprise itself." **Reves v. Ernst & Young, 507 U.S. 170, 185 (1993).** "The existence of an enterprise is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." Furthermore "the definitive factor in determining the existence of the RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." **United States v. Goldin Indus., Inc., 219 F.3d 1271, 1275 (11th Cir. 2000).** More specifically a RICO Enterprise exists "where a group of persons associates, formally or informally, with the purpose of conducting an illegal activity. Furthermore, Halperin "must participate in the operation or management of the enterprise itself." **Reves v. Ernst & Young, 507 U.S. 170, 185 (1993).** That is Halperin "must have some part in directing" the affairs of the enterprise. **ID. at 179**

8

To successfully allege a pattern of racketeering activity, BOM must show that: (i) the defendants committed two or more predicate acts within a ten year period; (iii) the predicate acts were related to one another; and (iii) the predicate acts demonstrated criminal acts of a continuing nature. **H.J. Inc. v. Northwestern Bell Tel. Co. 492 U.S. 229, 239-243 (1989).**

BOM has alleged the predicate acts of Illegal Gratuity Payments, 18 U.S.C. §201(c); Mail Fraud, 18 U.S.C. §1341; Wire Fraud, 18 U.S.C. §1343; Travel Act, 18 U.S.C. §1952; and Hobbs Act 18 U.S.C. §1951 with the ultimate goal of defrauding BOM.

Alleging the predicate acts alone is not sufficient. This Circuit has held that "'a 'pattern of racketeering' activity requires proof of something beyond the two predicate acts themselves.' That something is the threat of continuing racketeering activity." **United States v. Gonzalez, 921 F.2d 1530, 1545 (11th Cir. 1991).** The continuity element of a pattern of racketeering activity is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address --one that is part of a pattern of ongoing, continuing criminality or that involves criminality that promises to continue into the future.

"Continuity" is both a closed-and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. . . . A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. . . . Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated. **H.J. Inc., 492 U.S. at 241-42, 109 S. Ct. at 2902.** Any examination of the issue must begin with the Supreme Court's warning that predicate acts "extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement . . . ." **H.J. Inc., 492 U.S. at 242, 109 S. Ct. at 2902.** This Circuit has determined that an alleged mail fraud scheme lasting approximately six months "was accomplished in too short a period of time . . . to

qualify it as a pattern of racketeering activity." **Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm., 953 F.2d 587, 593 (11th Cir. 1992)**; see also **Hutchinson v. Wickes Cos., Inc., 726 F. Supp. 1315, 1320 (N.D. Ga. 1989)** (questioning in dicta whether two years can be a "substantial period of time").

The overwhelming weight of case authority suggests that nine months is not an adequately substantial period of time. Moreover, the alleged racketeering activity was related to the settlement of a single lawsuit, and, notably, was not designed to perpetrate racketeering with respect to a series of cases. Indeed, in cases like this one, where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering [*35] even when the scheme took place over longer periods of time. See, e.g., **Efron, 223 F.3d at 18** (noting that "the fact that a defendant has been involved in only one scheme with a singular objective and a closed group of targeted victims" supports the conclusion that there is no continuity); **Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 310 U.S. App. D.C. 409, 48 F.3d 1260, 1265 (D.C. Cir. 1995)** (predicate acts occurring over three year period insufficient to allege pattern of racketeering when complaint alleged a single scheme with a single goal);

## B.  Pleading Special Matters

**Fed. Rule Civ.P. 9(b)** states (a) Fraud or Mistake; Conditions of Mind.  In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge and other conditions of a person's mind may be alleged generally. **Rule 9 (b)** applies when Plaintiff's Rico Claim is based on a pattern of Mail and Wire Fraud offenses.  **Brooks v. Blue Cross and Blue Shield of Florida, Inc.  116 F3d 1364, 1380-82 (11th Cir. 1997).** "Rico complaints must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud."  **Ambrosia Coal & Constr.**

**Co. v Morales 482 F3d 1309, 1316 (11 Cir. 2007).**  In a case involving multiple Defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations "lumping" multiple defendants together are insufficient.  **Id. At 1317; Brooks, 116 F3d at 1381.**  The particularity requirement serves an important purpose in fraud actions by alerting the defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of fraudulent behavior.   **Ziemba v Cascade Intern., Inc., 256 F3d 1994, 1202 (11 Cir. 2001).**  **Rule 9 (b)** also serves to eliminate fraud actions in which all the facts are learned through discovery after the Complaint is filed.  **Friedlander v. Nims, 75 Fed 2d 810, 813 n.3 (11th Cir, 1985).**  If **Rule 9 (b)** is to carry any water, it must mean that an essential allegation and circumstances of fraudulent conduct cannot be alleged in a conclusory fashion....plaintiff is not expected to actually prove his allegations, but must offer more than mere conjecture."  **U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc., 290 Fed 3d 1301, 1313 (11th Cir. 2002).**

### C. Fraud

Common Law Fraud in Florida is defined as ""(1) a misrepresentation of a material fact; (2) [a] a knowledge of the representor of the misrepresentation, or [b] representations made by the representor without knowledge to the truth or falsity, or [c] representations made under circumstances in which the representor ought to have known, if he did not know, of the falsity thereof; (3) an intention that the representor induce another to act on it; and (iv) reasonable reliance thereon by the other person; and (4) resulting injury to the party acting in justifiable reliance on the representation."  **Sheen v. Jenkins, 629 So. 2d 1033, 1033-1036 (Fla. 4th DCA 1993); (quoting Sherban v. Richardson, 445 So. 2d 1147, 1148 (Fla. 4th DCA 1984); Yusem v. Butler, 966 So. 2d 405 (Fla. 4th DCA 1997).**

BOM has readily admitted that it never had any contact with Halperin and has never made a claim of misrepresentation against Halperin[33].  **Fed. R. Civ. P 9 (b)** is quite clear.  "In all averments of

---

[33] See Exhibit A hereto.

fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. This is clearly not the case in this matter. Where plaintiff fails to establish one element of the fraud, ie. misrepresentation, the claim of fraud is defeated. **Sheen v. Jenkins., 629 So. 2d 1033, 1033-1036(Fla. 4th DCA 1993).**

### D. Extraterritoriality

Halperin asserts that RICO claims cannot reach the extraterritorial conduct of this action. The Courts are divided over this theory. Some have concluded that RICO does not apply extraterritorially, as Congress made no explicit statement to that effect. **Jose v.M/V Fir Grove, 801 F. Supp. 349 (D. Or. 1991).** Other Courts have held that RICO may apply if conduct material to the completion of the racketeering occurs in the United States. **North South Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2d Cir. 1996).** In **Liquidition Commission of Banco Intercontinental, S.A. v. Luis Alverez, Wadeville Investments, Ltd., 530 F3d 1339 (11 Cir. 2008).** This circuit appears to hold the later view.

It held the effects test was not met where no United States person or business was harmed by the scheme. The effects were predominantly felt in the Dominican Republic. **Id. At 1359.** American Courts will not exercise jurisdiction over a transactional securities fraud suit if the conduct occurring in the United States is preparatory or far removed from the consummation of the fraud. See **North South Fin., 100 F3d at 1052-3.** Likewise extraterritorial RICO jurisdiction may not be appropriate where the utilization of American mail or wires were used to prepare for a cover-up of a fraud scheme perpetrated by foreigners against other foreigners. **Id.**

**POINT II**

**COUNT II OF PLAINTIFF'S COMPLAINT**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**CONSPIRACY TP CONDUCT THE AFFAIRS**
**OF THE ENTERPRISE THROUGH A PATTERN OF RACKETEERING**
**ACTIVITY  IN VIOLATION OF §1962 (C)**
**IS INSUFFICIENT AS A MATTER OF LAW**

In order to establish a RICO conspiracy under **18 U.S.C. §1962(d)**, BOM must show that Halperin is in violation of **18 U.S.C. §1962 (c). U.S. v. Goldin Indus., 219 Fed. 3d 1271, 1274 (11th Cir. 2000).** To state a claim under this section BOM must allege facts to support an agreement to violate substantive provisions of the RICO statute. Jackson v. Bell South Telecom., 372 F3rd 1250, **Jackson v. Bell South Telecom., 372 F3rd 1250 (11 Cir. 2004).**

In order to establish a RICO conspiracy under **§ 1962(d)** BOM must prove that Halperin objectively manifested, through words or actions, an agreement to participate in the affairs of the enterprise through the commission of two or more predicate crimes. The focus is on Halperin's agreement to participate in the enterprise through a pattern of racketeering activity. **United States v. To, 144 F3d 737, 744 (11th Cir. 1998).** BOM can show Halperin's agreement to participate in one of two ways: "(1) the government may show that the defendant agreed to the overall objective of the conspiracy, through circumstantial evidence showing that the defendant must necessarily have known that the others were also conspiring to participate in the same enterprise through a pattern of racketeering activity; or (2) the government may show that the defendant agreed personally to commit two predicate crimes and therefore agreed to participate in a 'single objective' conspiracy. **Id at 744 – 746.** Mere association with co-conspirators or knowledge of their illegal activity is not enough to establish a defendant's agreement to participate, **Id at 746.**

### POINT III

### COUNT III OF PLAINTIFF'S COMPLAINT
### CIVIL THEFT PURSUANT TO FLORIDA STATUTE §772.11

In **Moynet v. Courtois, 8 So. 3d 377, 380 (Fla. 3d DCA 2009)**, the Court stated that plaintiff's "failure to allege criminal intent is fatal to their cause of action for civil theft. Moreover, there are no other facts alleged from which criminal intent may be implied." "While the words "criminal intent" did not appear on the complaint, it is quite [*7] detailed in setting forth how the defendants conspired

to defraud Infante of her money." **Infante v. Vantage Plus Corp., 27 So. 3d 678 (Fla.Dist, Ct. App. 3d Dist. 2009).**

It is apparent from reading Plaintiff's Amended Complaint that its claims against Halperin are based in their allegation that "Defendants formed the Enterprise to execute and attempt to execute a scheme to defraud BOM of money and property.[34] **Fed. Rule Civ.P. 9(b)** states (a) Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake". In cases involving allegations of fraud Plaintiff must state their claims of fraud with particularity against each and every defendant. Mere "lumping" is not sufficient. **Brooks v. Blue Cross and Blue Shield of Florida, Inc. 116 F3d 1364, 1380-82 (11th Cir. 1997).** Plaintiff clearly has not fulfilled its obligation under this test. In addition to all of its other failing, Plaintiff has never more than blindly allege that Halperin "received substantial fees from the transacting of the BOM DLC."[35] In fact BOM has done nothing more than allege that Halperin has knowingly obtain or used any personal property of BOM.. Mere lumping is not sufficient. There must be specificity.

## POINT IV

### COUNT IV OF PLAINTIFF'S COMPLAINT
### FRAUDULENT MISREPRESENTATION

**Fed. Rule Civ.P. 9(b)** states (a) Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake". In cases involving allegations of fraud Plaintiff must state their claims of fraud with particularity against each and every defendant. Mere "lumping" is not sufficient. **Brooks v. Blue Cross and Blue Shield of Florida, Inc. 116 F3d 1364, 1380-82 (11th Cir. 1997).** Plaintiff has readily admitted that "Halperin has never individually and/or corporately made any representations or warrantees or any

---

[34] *See* BOM Amended Complain, §280, Page 48.
[35] See BOM Amended Complaint §276(f), Page 47-48.

14

kind or character to BOM or any of its directors, officers, employees or other officials."[36]  In addition, BOM readily admits that Halperin has never had any contact whatsoever with BOM or any of its directors, officers, employees or other officials nor did he solicit or suggest that BOM participate in an investment related transaction.[37]

## POINT V

### COUNT V OF PLAINTIFF'S COMPLAINT
### NEGLIGENT MISREPRESENTATION

Plaintiff has readily admitted that "Halperin has never individually and/or corporately made any representations or warrantees or any kind or character to BOM or any of its directors, officers, employees or other officials."[38]  In addition, BOM readily admits that Halperin has never had any contact whatsoever with BOM or any of its directors, officers, employees or other officials nor did he solicit or suggest that BOM participate in an investment related transaction.[39]

## POINT VI

### COUNT IX OF PLAINTIFF'S COMPLAINT
### COMMON LAW INDEMNIFICATION

The genre of BOM's allegations are that "Defendants" made representations to BOM that the issued financial instruments would never be presented for payment and returned at maturity with no withholdings.[40] Plaintiff has readily admitted that "Halperin has never individually and/or corporately made any representations or warrantees or any kind or character to BOM or any of its directors, officers, employees or other officials."[41]  In addition, BOM readily admits that Halperin has never had any contact whatsoever with BOM or any of its directors, officers, employees or other officials nor did

---

[36] *See* Stipulation In Lieu of Bank of Mongolia Deposition §3, Page 2 Exhibit F hereto.
[37] *See* Exhibit A hereto.
[38] *See* Stipulation In Lieu of Bank of Mongolia Deposition §3, Page 2 Exhibit F hereto.
[39] *See* Exhibit A hereto.
[40] *See* Plaintiff's Amended Complaint, §351, Page 60.
[41] *See* Stipulation In Lieu of Bank of Mongolia Deposition §3, Page 2 Exhibit F hereto.

he solicit or suggest that BOM participate in an investment related transaction.[42]   Under these circumstances it is ludicrous to suggest that Halperin in any way ever agreed to indemnify BOM.

## POINT VII

### COUNT X OF PLAINTIFF'S COMPLAINT
### CONVERSION

It is apparent from reading Plaintiff's Complaint that is claims against Halperin are based in their allegation that "Defendants formed the Enterprise to execute and attempt to execute a scheme to defraud BOM of money and property.[43] **Fed. Rule Civ.P. 9(b)** states (a) Fraud or Mistake; Conditions of Mind.   In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake".   In cases involving allegations of fraud Plaintiff must state their claims of fraud with particularity against each and every defendant.   Mere "lumping" is not sufficient. **Brooks v. Blue Cross and Blue Shield of Florida, Inc. 116 F3d 1364, 1380-82 (11th Cir. 1997).** Plaintiff has readily admitted that "Halperin has never individually and/or corporately made any representations or warrantees or any kind or character to BOM or any of its directors, officers, employees or other officials."[44]  In addition, BOM readily admits that Halperin has never had any contact whatsoever with BOM or any of its directors, officers, employees or other officials nor did he solicit or suggest that BOM participate in an investment related transaction.[45]   Finally BOM has never even alleged that Halperin had dominion or control over the DLC and has done nothing more than allege that Halperin received and/or disbursed proceeds from the disposition of the DLC.

## POINT VIII

### COUNT XI OF PLAINTIFF'S COMPLAINT
### UNJUST ENRICHMENT

---

[42] *See* Exhibit A hereto
[43] *See* BOM Amended Complain, §280, Page 48.
[44] *See* Stipulation In Lieu of Bank of Mongolia Deposition §3, Page 2 Exhibit F hereto.
[45] *See* Exhibit A hereto

The elements to substantiate a claim for unjust enrichment are that (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.  In this action BOM claims that Halperin has been unjustly enriched by receiving the commodities and not paying BOM for the amount it paid under the DLCs.[46]   Mere lumping is not sufficient.  There is no specific showing anywhere in the amended complaint that Halperin ever received the commodities or benefited in any way from the sale thereof.

Dated:   June 17, 2010

James R. Halperin
*Pro se*
6237 San Michel Way
Delray Beach, FL 33484
(561) 495-0738
(954) 697-0417
vettesfl@comcast.net

---

[46] *See* Plaintiff's Amended Complaint §367, Page 62.

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

BANK OF MONGOLIA,                              )
                                               )
    Plaintiff,                             )
                                               )
    v.                                     )   CASE NO. 08-CV-60623
                                               )   Dimitrouleas-Snow
M&P GLOBAL FINANCIAL SERVICES, INC.,           )
M&P GLOBAL FINANCIAL SERVICES                  )
EUROPE, AG, BURTON D. GREENBERG,               )
JOEL E. GREENBERG, GT                          )
INTERNATIONAL, INC., JAMES R.                  )
HALPERIN AND SENOL TASKIN,                     )
                                               )
    Defendants.                            )
_____    )

## STIPULATION IN LIEU OF BANK OF MONGOLIA DEPOSITION

IT IS HEREBY STIPULATED AND AGREED, that the following facts shall be admitted by Bank of Mongolia ("BOM") as true and correct, in consideration for Defendant James R. Halperin ("Halperin") not deposing any and all of BOM directors, officers, employees or officials pursuant to Federal Rules of Civil Procedure 30 or 31. Halperin further agrees in consideration for this Stipulation to withdraw the Notice of Subpoena pursuant to which a deposition of the Bank of Mongolia is scheduled for April 2, 2010.

### Stipulation

1.    Neither Halperin nor Expar Investments Limited, Inc. has ever sent BOM or any of its directors, officers, employees, or other officials any letter, email or any other form of written communication, nor has BOM or any of its directors, officers, employees or other officials received any such letter, email or any other form of written communication from Halperin or Expar;

2.      Neither Halperin nor Expar Investments Limited, Inc. has ever contacted, met with, or spoken to any BOM directors, officers, employees or any other BOM officials.

3.      Halperin has never individually and/or corporately made any representations or warrantees of any kind or character to BOM or any of its directors, officers, employees or other officials;

4.      Halperin has never individually and/or corporately requested or suggested to BOM or any of its directors, officers, employees or other officials that BOM issue any bank guarantee, or any other financial instrument of any kind or character;

5.      Halperin has never individually and/or corporately solicited or suggested to BOM or any of its directors, officers, employees or other officials that BOM participate in an investment related transaction, nor did Halperin have any role in the affordable Housing Project (as defined in the Complaint); and

6.      The BOM only first became aware of Halperin in or around February 2008 based on information from Charmaine Too.

Dated:  Washington, DC and Delray Beach, FL
        March 31, 20010

Respectfully submitted,

MILBANK, TWEED, HADLEY,
& MCCLOY LLP
Counsel for Plaintiff
1850 K Street, N.W.,
Suite 1100
Washington, D.C. 20006
Ph:  (202) 835-7547
Fax: (202) 263-7547

James R. Halperin
6237 San Michel Way
Delray Beach, Florida 33484
vettesfl@comcast.net

*Pro Se Defendant*

MICHAEL D. NOLAN (admitted *pro hac vice*)
MNolan@milbank.com
EDWARD G. BALDWIN (admitted *pro hac vice*)
EBaldwin@milbank.com

ATKINSON, DINER, STONE
MANKUTA & PLOUCHA, P.A.
Co-Counsel for Plaintiff
100 S.E. 3rd Avenue, Suite 1400
Ft. Lauderdale, FL  33394
Ph:  (954) 925-5501
Fax: (954) 920-2711
DAVID B. MANKUTA
FLORIDA BAR NO.  216 801
DBM@atkinson-diner.com
JOSE M. SANCHEZ
FLORIDA BAR NO. 0050288
JMS@atkinson-diner.com

*Counsel for Plaintiff Bank of Mongolia*

3

# EXHIBIT B

# EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** (hereinafter referred to as the "Agreement") made as of the 15th day of December, 2001 by and between **EXPAR INVESTMENTS LIMITED, INC.,** a corporation duly organized under the laws of the State of Florida State (hereinafter referred to as the "Company"), and **JAMES R. HALPERIN** OF 6237 San Michel Way, Delray Beach, FL 33484, (hereinafter referred to as the "Employee").

## RECITALS

**WHEREAS,** Employee represents that he has expertise in the areas of Legal and Business Consultancy, and is ready, willing, and able to provide his expertise to Company on the terms and conditions set forth herein; and

**WHEREAS,** Company, in reliance on Employee's representations, is willing to engage Employee on the terms and conditions set forth herein;

**NOW THEREFORE,** in consideration of the obligations herein made and undertaken, the parties, intending to be legally bound, covenant and agree as follows:

1. **Term of Employment**. Subject to the provisions for termination set forth below this Agreement will begin on December 15, 2002 and terminate on December 15, 2002 and continue from year to year thereafter unless sooner terminated.

2. **Salary**. The Company shall pay Employee a salary of $50,000.00 per year, for the services of the Employee.

3. **Duties and Position**. The Company herewith hires the Employee in the capacity of President in charge of Legal and Business Consultancy. The Employee's duties may be reasonably modified at the Company's discretion from time to time.

4. **Employee to Devote Full Time to Company**. The Employee will devote full time, attention, and energies to the business of the Company, and, during this employment, will not engage in any other business activity, regardless of whether such activity is pursued for profit, gain, or other pecuniary advantage. Employee is not prohibited from making personal investments in any other businesses provided those investments do not require active involvement in the operation of said companies.

5. **Confidentiality of Proprietary Information**. Employee agrees during the term of this employment and for a period of five years after the termination thereof, not to reveal confidential information, or trade secrets to any person, firm, corporation, or entity. Should Employee reveal or threaten to reveal this information, the Company shall be entitled to an injunction restraining the Employee from disclosing same, or from rendering any services to any entity to whom said information has been or is threatened to be disclosed, the right to secure an injunction is not exclusive, and the Company may pursue any other remedies it has against the Employee for a breach or threatened breach of this condition, including the recovery of damages from the Employee.

7.  **Reimbursement of Expenses**. The Employee may incur reasonable expenses for furthering the Company's business, including expenses for entertainment, travel, and similar items. The Company shall reimburse Employee for all business expenses after the Employee presents an itemized account of expenditures, pursuant to Company policy.

8.  **Vacation**. The Employee shall be entitled to a yearly vacation of 3 weeks at full pay.

9.  **Disability**. In the event that the Employee cannot perform the duties because of illness or incapacity for a period of more than 3 weeks, the compensation otherwise due during said illness or incapacity will be reduced by fifty (50%) percent. The Employee's full compensation will be reinstated upon return to work. However, if the Employee is absent from work for any reason for a continuous period of over three months, the Company may terminate the Employee's employment, and the Company's obligations under this agreement will cease on that date.

10.  **Termination of Agreement**. Without cause, the Company may terminate this Agreement at any time upon 90 days' written notice to the Employee. If the Company requests, the Employee will continue to perform his duties and will be paid his regular salary up to the date of termination. In addition, the Company will pay the Employee on the date of the termination a severance allowance of $10,000.00 less taxes and Social Security required to be withheld. The Employee may terminate employment upon 90 days' written notice to the Company. Employee may be required to perform his or her duties and will be paid the regular salary to date of termination but shall not receive severance allowance. Notwithstanding anything to the contrary contained in this agreement, the Company may terminate the Employee's employment upon 30 days' notice to the Employee should any of the following events occur:

   a)  The sale of substantially all of the Company's assets to a single purchaser or group of associated purchasers; or
   b)  The sale, exchange, or other disposition, in one transaction of the majority of the Company's outstanding corporate shares; or
   c)  The Company's decision to terminate its business and liquidate its assets; or
   d)  The merger or consolidation of the Company with another company; or
   e)  Bankruptcy or chapter 11 reorganization.

11.  **Death Benefit**. Should Employee die during the term of employment, the Company shall pay to Employee's estate any compensation due through the end of the month in which death occurred.

12.  **Restriction on Post Employment Compensation**. For a period of three ( 3 ) years after the end of employment, the Employee shall not control, consult to or be employed by any business similar to that conducted by the company, either by soliciting any of its accounts or by operating within Employer's general trading area.

2

13. **Assistance in Litigation**. Employee shall upon reasonable notice, furnish such information and proper assistance to the Company as it may reasonably require in connection with any litigation in which it is, or may become, a party either during or after employment.

14. **Effect of Prior Agreements**. This Agreement supersedes any prior agreement between the Company and the Employee, except that this agreement shall not affect or operate to reduce any benefit or compensation inuring to the Employee of a kind elsewhere provided and not expressly provided in this agreement.

15. **Settlement by Arbitration**. Any claim or controversy that arises out of or relates to this agreement, or the breach of it, shall be settled in accordance with the Laws of the State of Florida by arbitration in accordance with the rules of the American Arbitration Association in Palm Beach County Florida.. Judgment upon the award rendered may be entered in any court of competent jurisdiction.

16. **Limited Effect of Waiver by Company**. Should Company waive breach of any provision of this agreement by the Employee, that waiver will not operate or be construed as a waiver of further breach by the Employee.

17. **Severability**. If, for any reason, any provision of this Agreement is held invalid, all other provisions of this agreement shall remain in effect.

18. **Oral Modifications Not Binding**. This instrument is the entire Agreement of the Company and the Employee. Oral changes have no effect. It may be altered only by a written agreement signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

Signed this 15th day of December, 2001.

Expar Investments Limited, Inc.                    Employee

By _Adrienne Halperin_                             _James R. Halperin_
Adrienne Halperin, Treasurer                       James R. Halperin

3

# EXHIBIT C

## BANK GUARANTEE

Certified true copy

*Orgilmaa Odsuren*
*Secretary to the Governor*

| | |
|---|---|
| Bank Guarantee No | 004 |
| Name of Issuing Bank | BANK OF MONGOLIA (Central Bank) |
| Address | 210646 Baga toiruru 9, Chingeltei duureg. |
| | Ulaanbataar, Mongolia |
| Currency | United States Dollars |
| Amount | 50,000,000.00USD |
| Issued at | Ulaanbataar, Mongolia |
| Issuing Date | August 31, 2005 |
| Maturity Date | September 1, 2010 |
| Beneficiary | Stoneleigh International Limited |
| Address | Unit Level 13 (E), Main Office Tower, Financial |
| | Park Labuan, Jalan Merdeka 87000 Labuan |
| | Federal Territory of Malaysia |
| Issuing Bank Phone | 976-11-322169 |
| Issuing Bank Fax | 976-11-311471 |
| SWIFT | BOMUMNUB |
| Contact Officer | O Chuluunbat, Governor |

**GENTLEMEN:**

We, Bank of Mongolia (The Central Bank), 210646 Baga Toiruu 9 Chingeltei duureg, Ulaanbaatar Mongolia, hereby open our irrevocable, unconditional Bank Guarantee in your favor in the amount of United States Dollars Fifty Million ($50,000,000.00) which is available for payment at our counters in Ulaanbaatar against your draft drawn at sight on us accompanied by this original Bank Guarantee

The draft drawn under this credit must be marked on the face "Drawn under Bank Guarantee No 004 ...

Such payment shall be made without off set and free of any deductions or charges withholdings of any nature now or hereafter, imposed, levied, collected, withheld or assessed by the Government of Mongolia or any other political subdivision or authority thereof or therein

This Guarantee is transferable, assignable and negotiable without presentation of it to us and without payment of any fees.

We hereby engage with you the draft drawn hereunder will be duly honored by us if drawn and presented in accordance with the terms and conditions stated in this Bank Guarantee.

This Bank Guarantee shall terminate upon the earlier of the expiry date of this Bank Guarantee and or the draw by the Beneficiary in accordance with the terms hereof, and or the written request for cancellation of this Bank Guarantee by the Beneficiary.

This Guarantee is subject to the Uniform Customs and Practices for Documentary Securities (latest-version) International Chamber of Commerce (ICC) Publication No. 500

This Guarantee shall be governed by and shall be construed in accordance with the laws of the Mongolia and USA

This Bank Guarantee shall be returned to Issuer free and clear of all liens and encumbrances 15 banking days after maturity.

For and on behalf of Bank of Mongolia

O Chuluunbat
Governor

For and on behalf of Bank of Mongolia

B Lkhagvasuren
Director of the Accounting Department

## BANK GUARANTEE

**Certified true copy**

Orgilmaa Odsüren
Secretary to the Governor

| | |
|---|---|
| Bank Guarantee No | 001 |
| Name of Issuing Bank | BANK OF MONGOLIA (Central Bank) |
| Address | 210646 Baga toiruu 9, Chingeltei duureg, Ulaanbataar, Mongolia |
| Currency | United States Dollars |
| Amount | 50 000,000 00USD |
| Issued at | Ulaanbataar, Mongolia |
| Issuing Date | August 31, 2005 |
| Maturity Date | September 1, 2010 |
| Beneficiary | Stoneleigh International Limited |
| Address | Unit Level 13 (E), Main Office Tower, Financial Park Labuan, Jalan Merdeka 87000 Labuan Federal Territory of Malaysia |
| Issuing Bank Phone | 976-11-322169 |
| Issuing Bank Fax | 976-11-311471 |
| SWIFT | BOMUMNUB |
| Contact Officer | O Chuluunbat, Governor |

**GENTLEMEN:**

We, Bank of Mongolia (The Central Bank) 210646 Baga Toiruu 9 Chingelter duureg, Ulaanbaatar Mongolia hereby open our irrevocable, unconditional Bank Guarantee in your favor in the amount of United States Dollars Fifty Million ($50,000,000.00) which is available for payment at our counters in Ulaanbaatar against your draft drawn at sight on us accompanied by this original Bank Guarantee

The draft drawn under this credit must be marked on the face "Drawn under Bank Guarantee No 001

Such payment shall be made without off set and free of any deductions or charges withholdings of any nature now or hereafter, imposed, levied, collected, withheld or assessed by the Government of Mongolia or any other political subdivision or authority thereof or therein

This Guarantee is transferable, assignable and negotiable without presentation of it to us and without payment of any fees

We hereby engage with you the draft drawn hereunder will be duly honored by us if drawn and presented in accordance with the terms and conditions stated in this Bank Guarantee

This Bank Guarantee shall terminate upon the earlier of the expiry date of this Bank Guarantee and or the draw by the Beneficiary in accordance with the terms hereof, and or the written request for cancellation of this Bank Guarantee by the Beneficiary.

This Guarantee is subject to the Uniform Customs and Practices for Documentary Securities (latest version) International Chamber of Commerce (ICC) Publication No. 500

This Guarantee shall be governed by and shall be construed in accordance with the laws of the Mongolia and USA

This Bank Guarantee shall be returned to Issuer free and clear of all liens and encumbrances 15 banking days after maturity

For and on behalf of Bank of Mongolia

O Chuluunbat
Governor

For and on behalf of Bank of Mongolia

B Lkhagvasuren
Director of the Accounting Department

# BANK GUARANTEE

**Certified true copy**

Orgilmaa Odsuren
Secretary to the Governor

Bank Guarantee No : 002
Name of Issuing Bank : BANK OF MONGOLIA (Central Bank)
Address : 210646 Baga toiruru 9. Chingeltei duureg,
Ulaanbataar, Mongolia
Currency : United States Dollars
Amount : 50,000,000.00USD
Issued at : Ulaanbataar, Mongolia
Issuing Date : August 31, 2005
Maturity Date : September 1, 2010
Beneficiary : Stoneleigh International Limited
Address : Unit Level 13 (E), Main Office Tower, Financial Park Labuan, Jalan Merdeka 87000 Labuan Federal Territory of Malaysia
Issuing Bank Phone : 976-11-322169
Issuing Bank Fax : 976-11-311471
SWIFT : BOMUMNUB
Contact Officer : O Chuluunbat, Governor

### GENTLEMEN:

We, Bank of Mongolia (The Central Bank), 210646 Baga Toiruu 9 Chingeltei duureg, Ulaanbaatar Mongolia hereby open our irrevocable, unconditional Bank Guarantee in your favor in the amount of United States Dollars Fifty Million ($50,000,000.00) which is available for payment at our counters in Ulaanbaatar against your draft drawn at sight on us accompanied by this original Bank Guarantee.

The draft drawn under this credit must be marked on the face "Drawn under Bank Guarantee No 002 ...

Such payment shall be made without off set and free of any deductions or charges withholdings of any nature now or hereafter, imposed, levied, collected, withheld or assessed by the Government of Mongolia or any other political subdivision or authority thereof or therein.

This Guarantee is transferable, assignable and negotiable without presentation of it to us and without payment of any fees.

We hereby engage with you the draft drawn hereunder will be duly honored by us if drawn and presented in accordance with the terms and conditions stated in this Bank Guarantee.

This Bank Guarantee shall terminate upon the earlier of the expiry date of this Bank Guarantee and or the draw by the Beneficiary in accordance with the terms hereof, and or the written request for cancellation of this Bank Guarantee by the Beneficiary

This Guarantee is subject to the Uniform Customs and Practices for Documentary Securities (latest version) International Chamber of Commerce (ICC) Publication No. 500.

This Guarantee shall be governed by and shall be construed in accordance with the laws of the Mongolia and USA.

This Bank Guarantee shall be returned to Issuer free and clear of all liens and encumbrances 15 banking days after maturity.

For and on behalf of Bank of Mongolia

O. Chuluunbat
Governor

For and on behalf of Bank of Mongolia

B.Lkhagvasuren
Director of the Accounting Department

# BANK GUARANTEE

**Certified true copy**

Orgilmaa Odsuren
Secretary to the Governor

| | |
|---|---|
| Bank Guarantee No | 004 |
| Name of Issuing Bank | BANK OF MONGOLIA (Central Bank) |
| Address | 210646 Baga toiruru 9, Chingeltei duureg. |
| | Ulaanbataar, Mongolia |
| Currency | United States Dollars |
| Amount | 50,000,000.00USD |
| Issued at | Ulaanbataar, Mongolia |
| Issuing Date | August 31, 2005 |
| Maturity Date | September 1, 2010 |
| Beneficiary | Stoneleigh International Limited |
| Address | Unit Level 13 (E), Main Office Tower, Financial |
| | Park Labuan, Jalan Merdeka 87000 Labuan |
| | Federal Territory of Malaysia |
| Issuing Bank Phone | 976-11-322169 |
| Issuing Bank Fax | 976-11-311471 |
| SWIFT | BOMUMNUB |
| Contact Officer | O Chuluunbat, Governor |

**GENTLEMEN:**

We, Bank of Mongolia (The Central Bank), 210646 Baga Toiruu 9 Chingeltei duureg, Ulaanbaatar Mongolia, hereby open our irrevocable, unconditional Bank Guarantee in your favor in the amount of United States Dollars Fifty Million ($50,000,000.00) which is available for payment at our counters in Ulaanbaatar against your draft drawn at sight on us accompanied by this original Bank Guarantee.

The draft drawn under this credit must be marked on the face "Drawn under Bank Guarantee No 004. ...

Such payment shall be made without off set and free of any deductions or charges withholdings of any nature now or hereafter, imposed, levied, collected, withheld or assessed by the Government of Mongolia or any other political subdivision or authority thereof or therein

This Guarantee is transferable, assignable and negotiable without presentation of it to us and without payment of any fees

We hereby engage with you the draft drawn hereunder will be duly honored by us if drawn and presented in accordance with the terms and conditions stated in this Bank Guarantee.

This Bank Guarantee shall terminate upon the earlier of the expiry date of this Bank Guarantee and or the draw by the Beneficiary in accordance with the terms hereof, and or the written request for cancellation of this Bank Guarantee by the Beneficiary.

This Guarantee is subject to the Uniform Customs and Practices for Documentary Securities (latest version) International Chamber of Commerce (ICC) Publication No. 500.

This Guarantee shall be governed by and shall be construed in accordance with the laws of the Mongolia and USA

This Bank Guarantee shall be returned to Issuer free and clear of all liens and encumbrances 15 banking days after maturity

For and on behalf of Bank of Mongolia

O. Chuluunbat
Governor

For and on behalf of Bank of Mongolia

B Lkhagvasuren
Director of the Accounting Department

# EXHIBIT D

Asset Management Agreement dated 8 September 2005

# ASSET MANAGEMENT AGREEMENT

This agreement is hereby entered into on this 8th September 2005 by and between the two (2) parties listed below:

(A) M&P Global Financial Services, Inc., represented by Mr. Burton D. Greenberg of 4300 North University Drive, Suite D-106, Lauderhill, Florida 33351, USA ; Telephone No: 1-954-741-3800 & Telefax No: 1-954-749-3008, hereinafter known as (COMPANY);

and

(B) STONELEIGH INTERNATIONAL LIMITED, a corporation duly organized under the laws of Labuan, with registered offices at Unit Level 13 (E), Main Office Tower, Financial Park Labuan, Jalan Merdeka, 87000 Labuan, Federal Territory of Malaysia; Telephone No: 60-87-451-588 & Telefax No: 60-3-2611-1194, (hereinafter referred to as "CLIENT").

## RECITALS

Whereas, CLIENT is desirous to enter into a Private Placement Investment Management Program utilizing the financial instruments described in Article 1.1 below (hereinafter referred as "TRANSACTION"); and

Whereas, the COMPANY, is not a securities dealer or broker, but has experience in international banking procedures and the purchase and sale of Bank Instruments and Private Placement Investment Financing Programs and has agreements in place utilizing CLIENT'S financial instruments to establish credit lines utilizing the proceeds to enter into Private Placement Investment Financing Programs which trade in these instruments; and

WHEREAS, both parties hereto agree that this Agreement is for the mutual beneficial gain of each party;

NOW THEREFORE for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## 1. UNDERSTANDINGS:

1.1  Whereas, CLIENT is desirous to enter into an asset management program (hereinafter referred as "TRANSACTION") utilizing the following financial instruments:

| | |
|---|---|
| Bank Guarantee No | : 001 |
| Name of Issuing Bank | : BANK OF MONGOLIA (The Central Bank) |
| Amount | : 50,000,000.00USD |
| Issued at | : Ulaanbataar, Mongolia |
| Issuing Date | : August 31, 2005 |
| Maturity Date | : September 1, 2010 |

| | |
|---|---|
| Bank Guarantee No | : 002 |
| Name of Issuing Bank | : BANK OF MONGOLIA (The Central Bank) |
| Amount | : 50,000,000.00USD |
| Issued at | : Ulanbataar, Mongolia |
| Issuing Date | : August 31, 2005 |
| Maturity Date | : September 1, 2010 |

| | |
|---|---|
| Bank Guarantee No | : 003 |
| Name of Issuing Bank | : BANK OF MONGOLIA (The Central Bank) |
| Amount | : 50,000,000.00 USD |
| Issued at | : Ulanbataar, Mongolia |
| Issuing Date | : August 31, 2005 |

COMPANYs Initials: _____                    CLIENTs Initials: _____

Asset Management Agreement dated 8 September 2005

| Maturity Date | : September 1, 2010 |
| --- | --- |
| Bank Guarantee No | : 004 |
| Name of Issuing Bank | : BANK OF MONGOLIA (The Central Bank) |
| Amount | : 50,000,000.00 USD |
| Issued at | : Ulanbataar, Mongolia |
| Issuing Date | : August 31, 2005 |
| Maturity Date | : September 1, 2010 |

1.2   CLIENT agrees to assign all of its ownership and rights of the above-described financial instruments to COMPANY simultaneously with the execution of this Agreement in furtherance of the TRANSACTION.

1.3   Whereas, the COMPANY, is not a securities dealer or broker, said party will through its direct protocol, arrange with its respective financial institutions to complete the TRANSACTION.

1.4   The COMPANY is authorized by the CLIENT to act on its interest to complete and consummate the above TRANSACTION.

1.5   The COMPANY will return the financial instruments to CLIENT free and clear of any and all liens and encumbrances at the end of the of the TRANSACTION.

## 2. DUTIES:

2.1   CLIENT will ensure that the Issuing Bank of the above-described financial instruments will transmit said instruments to the banking coordinates designated by COMPANY via SWIFT MT760. The SWIFT transmission will also confirm that the above-described financial instruments have been assigned to COMPANY. COMPANY will provide CLIENT with the designated banking coordinates no later than September 15, 2005.

2.2   The COMPANY will act as the asset manager to facilitate the following to:

2.2.1   Ensure that a credit line is raised against the bank instruments. The amount of line of credit will be no less than Fifty Percent (50%) of the total face value.

2.2.2   Ensure the effective and efficient management of the funds generated by the credit line through an asset management plan (AMP). Such AMP will derive an annual Return on Investment (ROI) to CLIENT through best effort at a minimum of Two Hundred Percent (200%) to Four Hundred Percent (400%) per annum of the amount in deposit on a yearly basis. ROI is based on the amount of the credit line.

2.2.3   Ensure the return the financial instruments to CLIENT free and clear of any and all liens and encumbrances at the end of the TRANSACTION.

2.3   Each party will execute their respective duties to this Agreement, without any interference or interruption of the other party.

2.4   The COMPANY has the right to change any of its banks at any time.

2.5   The private and confidential sources of each party are not a requisite to be exposed to this Agreement or the parties hereto.

COMPANYs Initials: _____          CLIENTs Initials: _____

Asset Management Agreement dated 8 September 2005

## 3. TERMS & CONDITIONS:

### 3.1 Terms:

3.1.1 The total amount of the TRANSACTION is Two Hundred Million United States Dollars (US $200,000,000.00). CLIENT acknowledges that COMPANY, contemporaneously with the execution of this Agreement and in furtherance of the TRANSACTION, herewith assigns the Financial Instruments to M & P Global Financial Services, Europe AG, a Company duly organized under the Laws of ZUG Switzerland and an affiliated Company of COMPANY (AFFILIATE).

3.1.2 This Agreement will expire on September 25, 2010.

3.1.3 The COMPANY will insure return the Financial Instruments to CLIENT free and clear of any and all liens and encumbrances at the end of the of the TRANSACTION.

## 4. PROCEDURES:

4.1 CLIENT will ensure that the Issuing Bank of the above-described Financial Instruments will transmit said instruments to the banking coordinates designated by COMPANY via SWIFT MT760. The SWIFT transmission will also confirm that the above-described financial instruments have been assigned to AFFILIATE.

4.2 Upon receipt of the SWIFT transmission and after the related authentications and verifications are completed, COMPANY will raise a credit line using the financial instruments as collateral. The amount of line of credit will approximate, but not be less than Fifty Percent (50%) of the total face value of the Financial Instruments.

4.3 COMPANY will ensure that the AMP will be initiated promptly.

4.4 CLIENT will receive bi-monthly disbursements from COMPANY. Return on investment will be based on the amount of the credit line. CLIENT must inform and provide specific instruction of bank/account for such disbursement to be credited.

4.5 CLIENT will be responsible for payments to all of the intermediaries. The parties acknowledge that Exper Investments Limited, Inc. is the sole intermediary to the TRANSACTION.

4.6 CLIENT will also be required to provide further documentation should the need arises to complete the agreement.

## 5. FORCE MAJEURE:

Under circumstances when the company deems that conditions as prescribed are not in favor of the CLIENT or the COMPANY, the COMPANY will not proceed to complete the transaction and shall not be liable for the failure to perform under the force majeure clauses as stated in the International Chamber of Commerce (ICC 500 or its latest version) Paris, France, which clauses are deemed to be incorporated herein by reference.

COMPANYs Initials: _____          CLIENTs Initials: _____

Asset Management Agreement dated 8 September 2006

## 6. GOVERNING LAW:

This Agreement is a full recourse contract concluded under the laws of the nations wherein the parties hereto are domiciled. The Laws of the State of Florida shall be the applicable law governing the construction, interpretation, execution, validity, enforceability, performance and any other such matter in respect of this Agreement, including breach or claim of breach thereof. Should any dispute or violation occur, to which an amicable settlement cannot be obtained by the parties, the parties hereto agree to have the matter arbitrated by the American Arbitration Association in Miami Florida, under the rules of the American Arbitration Association.

## 7. CONDITIONS:

7.1   The parties agree that all documents relating to this transaction will not change for the duration of this agreement.

7.2   The parties confirm that each is fully empowered, legally qualified, and duly authorized to execute this agreement and to be bounded thereby.

7.3   The parties acknowledge that they have had adequate time and opportunity to consult with their counsel of their choosing prior to execution for this agreement and that each fully understand the facts and has been fully informed as to any legal rights and obligations in connection therewith, by voluntary choice, each has executed this agreement freely and without reservation.

7.4   The CLIENT will be fully responsible for all institutional costs involved to complete the Transaction. Institutional costs refer to banks and government agencies fees and obligations associated with the issuance of the Financial Instruments.

7.5   Any change and/or modification to this Agreement must be made in writing. Should any provision of this Agreement be or become invalid by virtue of applicable law or fail enforceability, then this Agreement shall remain in full force and the invalid or unenforceable provision shall be replaced by provision(s) to be mutually agree upon between parties within the spirit and intent of the agreed terms. All statements and representation under this Agreement are made with full legal and corporate responsibility and any signed and witnessed facsimile copy, whether in whole or in part, shall be considered an original and binding document. Any modifications of this Agreement shall be made in writing as an "Addendum" and is to be executed by both parties as a condition precedent to the implementation of such modification.

7.6   This Agreement shall remain in full force and effect until upon revoked by both parties in writing and shall be binding upon parties, their heirs, successors and assigned agents, solicitors, and all associated parties involved in the transaction. When fully executed, the facsimile transmission of this Agreement to each of the parties herein of this agreement will be considered by the parties herein a lawful, legally enforceable, and a binding agreement as though it were original hard copy delivered to each party herein.

Asset Management Agreement dated 8 September 2005

## 8. NON-CIRCUMVENTION & NON-DISCLOSURE:

Both parties agree to respect each other's proprietary right and interest and shall consider all information including but not limited to the names, phone and telefax numbers, addresses, bank accounts as property of the providing party, and also to abide by the standard of non-circumvention & non-disclosure act as published by the International Chamber of Commerce (ICC) Paris, France. These ICC non-circumvention and non-disclosure standards are incorporated herein by reference.

This Agreement shall be kept confidential and is not to be reproduced in any manner whatsoever. Further, to this agreement shall not be given to a third party except those directly involved with the closing of the transaction(s) contemplated (i.e. all the information supplied herein, including individual names, telephone numbers etc) is to remain confidential and each party hereto expressly prohibits the other from releasing any such personal information to any third party.

Neither the COMPANY nor CLIENT will attempt to contact, deal with or solicit, either directly or indirectly, any party or institution introduced by other party in any manner whatsoever without the express written consent of the other party.

The understanding between the parties shall survive the termination of this agreement and shall remain in force and effect for FIVE (5) years from the date hereof.

## 9. TAXES, INSTITUTIONAL COSTS, COMMISSIONS AND FEES:

Both parties, individual and separately, accept liability for taxes, levies, duties, charges and any institutional costs that may be applicable in the execution of their respective roles.

Further, both parties shall be responsible only for those commissions and fees that they have agreed in writing to pay. Each party shall indemnify and hold harmless the other party against any claim, demand or expense from any third party, however arising.

## 10. INDEMNIFICATION:

Each party herein and party to this agreement will hold each other harmless of any activity outside the scope if this undertaking, which would be illegal, legally or not legally damaging, legal damages, all liens and law suits that would be brought against either party. Both parties will at their expense, defend either and/or both parties, of any such legal cases that may arise out of activities "only" of this agreement and/or jointly caused by the individual parties, on behalf of this agreement, while transacting business in accordance with this agreement.

## 11. ENDORSEMENTS:

The parties have entered into this agreement in good faith and each will use its best efforts, in the full spirit of cooperation, to promptly achieve the purposes set forth. Each party shall negotiate in good faith with respect to any future agreements required by subsequent events. The parties acknowledge and agree that this agreement is executed under oath with full legal responsibility.

This Agreement is valid for five (5) banking days from this agreement date unless both parties execute the Agreement.

COMPANYs Initials: _____          CLIENTs Initials: _____

Asset Management Agreement dated 8 September 2005

## SIGNATURE PAGE

In WITNESS WHEREOF: The parties, through their authorized signatures, hereto execute this agreement for all the purposes therein stated on this 8th day of September 2005 first above written.

ACCEPTED AND AGREED BY:
(COMPANY)

M&P Global Financial Services, Inc.
Burton D. Greenberg
CEO
Passport No: 203202752
Expires on   31 July 2010

ACCEPTED AND AGREED BY:
(CLIENT)

Stoneleigh International Limited
George E. Chalmers
President
Passport No: 710788152 (USA)       **Before me**
Expires on 9 June 2014

No: W 402
P SAROJA
PPN

No. 54, Ground Floor
Jalan Hang Kasturi,
50050 Kuala Lumpur.

09 SEP 2005

COMPANYs Initials:                              CLIENTs Initials:

Page 6 of 6

# EXHIBIT E

## AGREEMENT FOR NON-CIRCUMVENTION
## AND NON-DISCLOSURE

This Agreement entered into as of the 8th day of September, 2005 by and **STONELEIGH INTERNATIONAL LIMITED** a corporation duly organized under the laws of Labuan, with registered offices at Unit Level 13 (E), Main Office Tower, Financial Park Labuan, Jalan Merdeka, 87000 Labuan, Federal Territory of Malaysia. represented by George E. Chalmers, President (hereinafter referred to as "SIL" or "PARTY OF THE FIRST PART") and **EXPAR INVESTMENTS LIMITED, INC.** (hereinafter referred to as "EXPAR" or as "PARTY OF THE SECOND PART") is specifically intended to set forth those terms, conditions and understandings this date agreed upon by and between the parties hereto.

1.     Definitions and terms of reference in this Agreement:

(a)     "Connected Person(s)", with reference to any party or parties hereto shall include, but shall not be limited to, any banks, lawyers, trustees, agents, corporations, consultants, advisors, consortiums and/or syndicate members, associates, affiliates, and/or any person, corporation or entity whatsoever which comes to have any knowledge or information concerning any and all transactions covered by this Agreement as a result of any communication directly with, originating from, or relating to, any Party hereto

(b)     "Transaction(s)" shall include any and all stages of negotiations, discussions, communications (of whatever form) and completions between the Parties hereto and their Connected Persons regarding opportunities to enter into business transactions made available by Party of the Second Part, which transactions shall specifically include arranging the purchase and sale of all types of assets, commodities and the arrangement of all types of financial facilities.

(c)     References to the singular shall include the plural, the masculine shall include the feminine, the whole shall include the part, the personal shall include the corporate, and in all cases vice-versa.

(d)     Reference to the Parties hereto shall include the trustees, heirs, successors, principals, clients, assignees, appointees, administrators, executors, and, where appropriate, successors in interest, of such parties.

2.     Party of the First Part undertakes and warrants not, by any means or under any circumstances (whether in the United States of America or in any other Country, State or Principality), to circumvent Party of the Second Part, nor Party of the Second Part to circumvent Party of the First Part, with regard to any of the opportunities to enter into Transactions made available to Party of the First Part by Party of the Second Part, at any time during the duration of this Agreement, by contacting or attempting to contact in any matter the owners and/or sellers or sources of the subject manner of such Transactions or their Connected Persons, either personally or through or with the assistance of Connected Persons in such a way as to gain for themselves or their Connected Persons and/or so as to prevent Party of the Second Part or their Connected Persons from receiving any (or less) fees, profits, commissions, remuneration or other material benefit whatsoever as may be due Party of the Second Part from Party of the First Part.

I



3.      Party of the First Part hereby pledges to maintain absolute and total confidentiality concerning any and all information disclosed by Party of the Second Part relating to any transactions covered by this Agreement concerning any and all information (personal and/or otherwise) regarding Party of the Second Part without first obtaining the prior written permission of Party of the Second Part, except as necessary to obtain professional advice from accountants, attorneys or officers of a financial institution on a need-to-know basis.

4.      Party of the First Part agrees to keep confidential the name(s) of any and all financing or banking sources provided by Party of the Second Part or by his connected persons

5.      By this Agreement, Party of the First Part specifically agrees that neither he nor any connected person(s) will, for a period of five (5) years from the date of the successful completion of the first transaction, circumvent or deal directly with any entity or person to whom he has been introduced by Party of the Second Part, or with any of such entity's or persons affiliates or connected persons, without first securing the express written consent of Party of the Second Part. This provision is intended to be binding on not only Party of the First Part, but also on any of his associates, attorneys, accountants, agents, heirs, assignees, designees, and other connected persons, to the extent Party of the First Part has reasonable control over their conduct Party of the First Part also specifically agrees to keep confidential the names of any banks, bank officers, trusts, lending institutions, corporations, organizations or other individuals introduced to him by any such entity or person. Such identities shall remain confidential during the applicable transaction period and throughout the three (3) year term of this agreement, and shall include any telephone numbers, addresses, telex numbers and other valuable information, the release of which would or could cause financial injury to Party of the Second Part.

6.      This Agreement shall continue in full force and effect for a period of five (5) years from the date entered into and shall apply to any and all Transactions wherein the Party of the First Part was introduced by Party of the Second Part and shall include any subsequent follow-ups, extensions, add-ons, rollovers, or renegotiated and/or delayed transactions regardless of the success of earlier transactions. Party of the First Part expressly recognizes that information given and introductions made by Party of the Second Part shall remain the property of Party of the Second Part for the duration of this Agreement unless otherwise expressly agreed to by the introducing Party in writing.

7.      In the event of circumvention, upon successful completion of a transaction, in whole or in part, then Party of the First Part hereby agrees without any reservation to immediately and without delay pay to Party of the Second Part the full amount of all commissions, fees, charges and/or other benefits as may have been agreed to between the Parties.



2

8.      This Agreement shall include all transactions wheresoever transacted or performed in the world, and this Agreement shall be governed and construed according to the laws of the State of Florida, U. S A., and shall be subject to arbitration under the rules of the American Arbitration Association in Palm Beach County, Florida.

9.      The Parties hereto agree to interpret this Agreement in its broadest legal sense, and to voluntarily waive and renounce any and all rights of immunity, whether Diplomatic, Sovereign, or otherwise, so as to enable the Parties hereto to give full force and legal effect to the true purpose and intent of this Agreement.

10.     If any provision(s) of this agreement shall be declared by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall continue in full force and effect,

11.     Should litigation be commenced between the parties hereto, or their personal representatives, concerning any provision of this agreement, or the rights and duties of any person or entity in relation thereto, the party or parties prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to a reasonable sum as and for attorney fees.

12.     The failure of any party to insist upon strict compliance with any of the terms and/or conditions of this agreement shall not be deemed a waiver of that term or condition at any other or subsequent time.

13.     No agreement or understanding purporting to alter, vary, modify or extend this agreement or any provision hereof shall be binding upon any party hereto unless in writing and signed by the respective parties.

14.     This Agreement may be executed in one or more counterparts and by facsimile transmissions (facsimile transmissions shall be honored as originals). Each counterpart shall be deemed an original and all counterparts shall constitute one and the same instrument. It shall not be necessary for both Parties execute any single counterpart, so long as each Party executes at least one counterpart.

15.     The Parties hereto acknowledge that the true spirit of this Agreement is one of mutual trust and confidence, reliance on each other to do what is fair and equitable, and to honor what has been agreed to between the Parties hereto.

3



IN WITNESS WHEREFOF, the Parties hereunder have set their hands, intending to be bound thereby, on the day, month and year first above written.

**PARTY OF THF FIRST PART**
STONELEIGH INTERNATIONAL LIMITED

By _____
George E. Chalmers
Tel: (852) 2592-7133
Fax: (852) 9130-0892

**PARTY OF THE SECOND PART**
EXPAR INVESTMENTS LIMITED

By _____
James R. Halperin
Tel. (561) 495 - 0738
Fax: (561) 495-0944

4

**EXHIBIT I**
**AGREEMENT FOR NON-CIRCUMVENTION AND NON-DISCLOSURE**
**DATED July 22, 2004**

1.      Party of the First Part agrees to pay to the Party of the Second Part a commission in the amount of Ten percent (10%) of the gross income received by Party of the First Part. Party of the First Part hereby instructs M & P Global Financial Services, Inc., their successors and assigns ("M & P") to retain and distribute said payment to the order of Party of the Second Part.

2.      In addition to the commission referred to in Paragraph 1. above, in the event Party of the First Part requires assistance in the hypothecation of any asset, Party of the First Part agrees to pay to the Party of the Second Part an additional fee in the amount of One Eight of One percent (.125%) of the gross amount of the asset hypothecated by the Party of the First Part to compensate Party of the  Second Part for the services rendered in the hypothecation of the asset. Party of the First Part hereby instructs M & P Global Financial Services, Inc., their successors and assigns ("M & P") to retain and distribute said payment to the order of Party of the Second Part.

3.      In the event that M & P does not retain and distribute said payment to Party of the Second Part, Party of the First Part agrees to wire said payment to Party of the Second Part within forty-eight (48) hours of receipt of said payment by Party of the First Part.

4.      This Exhibit shall be lodged by Party of the Second Part with M & P and shall not be disclosed by the Parties thereto to any third parties, with the sole exception of M & P, except in the event of a fee dispute or unsatisfactory accounting having been rendered by Party of the First Part to Party of the Second Part upon completion of each investment cycle.


IN WITNESS WHEREFOF, the Parties hereunder have set their hands, intending to be bound thereby, on the day, month and year first above written.

**PARTY OF THF FIRST PART**
STONELEIGH INTERNATIONAL LIMITED

By _____
    George E. Chalmers
    Tel: (852) 2592-7133
    Fax: (852) 9130-0892

**PARTY OF THE SECOND PART**
EXPAR INVESTMENTS LIMITED, INC

By _____
    James R. Halperin
    Tel. (561) 495 - 0738
    Fax:(561) 495-0944

5

# EXHIBIT F

# STONELEIGH INTERNATIONAL LIMITED

Unit Level 13(E), main Office Tower
Financial Park Labuan, Jalan Merdeka
87000 Labuan
FEDERAL TERRITORY OF MALAYSIA
Tel: 60-87-451-688      Fax: 60-87-453-688      Email:gc@stoneleighcapital.com

Date: September 12, 2005

To:   O. CHULUUNBAT, Governor
      BANK OF MONGOLIA
      Baga Toiruu – Ulaanbaatar – 46
      MONGOLIA

Re:   <u>ASSIGNMENT OF BANK GUARANTEE</u> Nos. 001, 002, 003 and 004 issued by
      THE BANK OF MONGOLIA (CENTRAL BANK) for an amount of
      $50,000,000USD each, for a total amount of $200,000,000USD

In order to raise and complete the funding of up to United States Dollars Eight
Hundred Seventy-nine Million ($879,000,000.00) for the Government of Mongolia's
Affordable Housing Project in Ulaanbaatar as per Agreement signed May 24, 2005
and Amendment to Agreement signed September 1, 2005 we will assign the Bank
Guarantees pursuant to relevant Asset Management Agreement(s) to M & P
Global Financial Services, Inc., 4300 North University Drive, Suite D-106,
Lauderhill, Florida 33351, USA in order to place and complete the financing.

As the beneficiary of the subject Bank Guarantees, We will irrevocably and
unconditionally assign and transfer the Bank Guarantees for the purpose of the
Project Funding consistent with the terms and conditions of the Agreement. The
Assignee is;

M & P Global Financial Services, Inc.
4300 North University Drive, Suite D-106
Lauderhill, Florida 33351
USA

M & P Global Financial Services, Inc., will further assign the Bank Guarantees to
its Swiss affiliate M & P Global Financial Services, Europe AG to facilitate the
placement of the financing for the funding of the above mentioned project.





The details of the above-mentioned bank guarantees are as follows:

1.    $50,000,000USD Bank Guarantee issued by the BANK OF MONGOLIA; with no interest; bearing Identification Number 001; with an issue date of August 31, 2005; and an expiration date of September 1, 2010;

2.    $50,000,000USD Bank Guarantee issued by the BANK OF MONGOLIA; with no interest; bearing Identification Number 002; with an issue date of August 31, 2005; and an expiration date of September 1, 2010;

3.    $50,000,000USD Bank Guarantee issued by the BANK OF MONGOLIA; with no interest; bearing Identification Number 003; with an issue date of August 31, 2005; and an expiration date of September 1, 2010; and

4.    $50,000,000USD Bank Guarantee issued by the BANK OF MONGOLIA; with no interest; bearing Identification Number 004; with an issue date of August 31, 2005; and an expiration date of September 1, 2010.

I am enclosing herewith the appropriate assignments for your records.

These assignments shall become effective as of the 12th day of September 2005 and shall be binding upon the parties hereto (the Assignor-STONELEIGH INTERNATIONAL LIMITED and the Assignee – BANK OF MONGOLIA) and respective successors and assigns.

By return Letter please acknowledge the assignment. Thank you.


Sincerely,

George E. Chalmers
President



# EXHIBIT G

# STONELEIGH INTERNATIONAL LIMITED

Unit Level 13(E), main Office Tower
Financial Park Labuan, Jalan Merdeka
87000 Labuan
FEDERAL TERRITORY OF MALAYSIA
Tel: 60-87-451-688    Fax: 60-87-453-688    Email:gc@stoneleighcapital.com

Date: September 12, 2005

To:    M & P Global Financial Services, Inc.
       4300 North University Drive, Suite D-106
       Lauderhill, Florida 33351
       USA

       Re:    Bank Guarantees No 001, 002, 003 and 004 issued by BANK OF
              MONGOLIA (The Central Bank) for an amount of $50,000,000USD
              each for a total amount of $200,000,000USD

With reference to the above-mentioned Bank Guarantee(s), we (the Assignor),
pursuant to the relevant Asset Management Agreement(s) between you and us,
hereby irrevocably and unconditionally assign, transfer and set over all of our
rights, title and benefits to you (the Assignee).

The details of the above-mentioned bank guarantees are as follows:

       1.     $50,000,000USD Bank Guarantee issued by the BANK OF
MONGOLIA (THE CENTRAL BANK) ; with no interest; bearing Identification
Number 001; with an issue date of August 31, 2005; and an expiration date of
September 10, 2010;

       2.     $50,000,000USD Bank Guarantee issued by the BANK OF
MONGOLIA (THE CENTRAL BANK); with no interest; bearing Identification
Number 002; with an issue date of August 31, 2005; and an expiration date of
September 10, 2010;

       3.     $50,000,000USD Bank Guarantee issued by the BANK OF
MONGOLIA (THE CENTRAL BANK) ; with no interest; bearing Identification
Number 003; with an issue date of August 31, 2005; and an expiration date of
September 10, 2010; and

       4.     $50,000,000USD Bank Guarantee issued by the BANK OF
MONGOLIA (THE CENTRAL BANK) ; with no interest; bearing Identification
Number 004; with an issue date of August 31, 2005; and an expiration date of
September 10, 2010.

It is further acknowledged herewith that you will further assign said Bank
Guarantees to M & P Global Financial Services, Europe AG, an affiliated
company, pursuant to relevant Asset Management Agreement(s) and terms

1

and conditions consistent with the May 24, 2005 Agreement and Amendment dated September 1, 2005, in furtherance of the financing contemplated under the Agreement.

This assignment shall become effective immediately and shall be binding upon the parties hereto (the Assignor and the Assignee) and respective successors and assigns.

Sincerely,
Stoneleigh International Limited

By_____
George E. Chalmers, President
USA Passport No. 710788152
Expires:  June 9, 2014

Witnessed by:

_____
James G. Johnson
Malaysia Passport # A13003343
Expiry: February 2nd 2010

Accepted And Agreed to:
M & P Global Financial Services, Inc.

By_____
Burton Greenberg, CEO
Passport No: 203202752
Expires:  31 July 2010

The BANK OF MONGOLIA (THE CENTRAL BANK) (Central Bank) Baga toiruu, Ulaanbaatar 46, MONGOLIA hereby acknowledges and confirms the receipt of this Assignment between Stoneleigh International and M&P Global Financial Services Inc. this 12th day of September, 2005.

_____
O. Chuluunbat
Governor

_____
B Lkhgvasuren
Director of the
Accounting Department

2

# EXHIBIT H

LETTER OF ASSIGNMENT

Date: September 12, 2005

To:    M & P Global Financial Services, Europe AG
       c/o M & P Global Financial Services, Inc.
       4300 North University Drive, Suite D-106
       Lauderhill, Florida 33351
       USA

       Re:    Bank Guarantees No 001, 002, 003 and 004 issued by BANK OF
              MONGOLIA (The Central Bank) for an amount of $50,000,000USD
              each for a total amount of $200,000,000USD

With reference to the above-mentioned Bank Guarantee(s), we (the Assignor),
pursuant to relevant Asset Management Agreement(s) between M & P Global
Financial Services, Inc. and Stoneleigh International Limited  hereby irrevocably
and unconditionally assign, transfer and set over all of our rights, title and
benefits to you (the Assignee) in furtherance of the financing contemplated under
such Agreement.

The details of the above-mentioned bank guarantees are as follows:

       1.     $50,000,000USD Bank Guarantee issued by the BANK OF MONGOLIA
(THE CENTRAL BANK) ; with no interest; bearing Identification Number 001; with
an issue date of August 31, 2005; and an expiration date of September 10, 2010;

       2.     $50,000,000USD Bank Guarantee issued by the BANK OF MONGOLIA
(THE CENTRAL BANK); with no interest; bearing Identification Number 002; with
an issue date of August 31, 2005; and an expiration date of September 10, 2010;

       3.     $50,000,000USD Bank Guarantee issued by the BANK OF MONGOLIA
(THE CENTRAL BANK) ; with no interest; bearing Identification Number 003; with
an issue date of August 31, 2005; and an expiration date of September 10, 2010;
and

       4.     $50,000,000USD Bank Guarantee issued by the BANK OF MONGOLIA
(THE CENTRAL BANK) ; with no interest; bearing Identification Number 004; with
an issue date of August 31, 2005; and an expiration date of September 10, 2010.

This assignment shall become effective immediately and shall be binding upon the parties hereto (the Assignor and the Assignee) and respective successors and assigns.

Sincerely,
M & P Global Financial Services, Inc.

By _____
Burton Greenberg, CEO
Passport No: 203202752
Expires: 31 July 2010

VANESSA RIVERA
Comm# DD0397924
Expires 2/20/2009
Bonded thru (800)432-4254
Florida Notary Assn., Inc

Witnessed by:

_____
Gayle Santuccio

VANESSA RIVERA
Comm# DD0397924
Expires 2/20/2009
Bonded thru (800)432-4254
Florida Notary Assn., Inc

Accepted And Agreed to:
M & P Global Financial Services, Europe AG

By _____
Burton Greenberg, CEO
Passport No: 203202752
Expires: 31 July 2010

VANESSA RIVERA
Comm# DD0397924
Expires 2/20/2009
Bonded thru (800)432-4254
Florida Notary Assn., Inc

The BANK OF MONGOLIA (THE CENTRAL BANK) MONGOLIA Baga toiruu, Ulaanbaatar, Mongolia hereby acknowledges and confirms this Assignment between M&P Global Financial Services Inc. and M&P Global Financial Services, Europe AG this 12th day of September 2005.

_____
O. Chuluunbat
Governor

_____
B Lkhgvasuren
Director of the
Accounting Department